IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DERRICK and ANITA SEYMORE;
SHANE SMITH;
THADDEUS and KAY WINTERS;
BRIAN and STEPHANIE PARKER;
KEITH GRIFFIN;
ARNOLD and SHELLY FELBERMAYER;
JAMES and NORMA TAYLOR;
GENE and EMMA ADAMS;
CONNIE and STEWART KIRBY;
GREGORY HORNESS;
ANTHONY and SHERRY HEALY;
LINDA CRIDER;
JONATHAN and RENEE GORDON;
BRIAN STROUD and
JEFFREY and SARA MESKO                                    PLAINTIFFS

vs.                          NO. 4:10-CV-239 BSM

UNION PACIFIC RAILROAD COMPANY                      DEFENDANT

## PLAINTIFFS' PRE-TRIAL DISCLOSURE SHEET

1.    The identity of the party submitting the information.

**RESPONSE NO. 1**:    Plaintiffs, Derrick and Anita Seymore, Shane

Smith, Thaddeus and Kay Winters, Brian and Stephanie Parker, Keith

Griffin, Arnold and Shelly Felbermayer, James and Norma Taylor, Gene

and Emma Adams, Connie and Stewart Kirby, Gregory Horness, Anthony

and Sherry Healy, Linda Crider, Jonathan and Renee Gordon, Brian Stroud and Jeffrey and Sara Mesko.

2.     The names, addresses and telephone numbers of all counsel for the parties.

**RESPONSE NO. 2**: Counsel for plaintiff:   James F. Swindoll of the Law Offices of James F. Swindoll, 212 Center Street, Suite 300, Little Rock, Arkansas  72201, (501) 374-1290.

Counsel for defendant: Mr. Joseph P. McKay, Mr. Travis J. Flower, Friday, Eldredge & Clark, LLP, Attorneys at Law, 400 Capitol Ave., Suite 2000, Little Rock, Arkansas  72201, (501)370-1497/376-2147 fax

3.     A brief summary of the claims and relief sought.

**RESPONSE NO. 3**:     Plaintiffs   seek   recovery   from   damages sustained due to flooding upon their property and into their homes in October and December of 2009 and May 2011.  Plaintiffs allege that the three (3) floods are a trespass upon plaintiffs' property caused directly or indirectly by the operation of the railroad and the management of their drainage.

Plaintiffs also allege that the negligence of the defendant caused the flooding.  They contend that the railroad's management of the railbed and drainage created an unreasonable condition upon the plaintiffs' property

(floods) and the railroad knew and had a reasonable opportunity to correct the condition and did not.

    4.    Prospects for settlement.

**RESPONSE NO. 4**:    Settlement is possible but not probably in this case.

    5.    The basis for jurisdiction or objections to jurisdiction.

**RESPONSE NO. 5**:    Diversity jurisdiction exist.

    6.    A list of all pending motions.

**RESPONSE NO. 6**:    Two (2) summary judgment motions are awaiting a decision.

    7.    A concise summary of facts.

**RESPONSE NO. 7**:    Union Pacific owns and maintains a railbed and trestles near the plaintiffs subdivision. The railroad, has reduced the drainage necessitated by their railbed over the years. Twice in 2009, (October 31, 2009, and December 24, 2009) and May 1, 2011, the water was retained by the railbed during the rain storms and forced backwards and uphill to the plaintiffs subdivision and into their homes damaging them, the personal property in them and reducing and destroying the value of the homes.

    8.    All proposed stipulations.

### RESPONSE NO. 8:

1.    In 1873 the Cairo and Fulton Railroad built the tracks that run from Beebe, Arkansas to Ward, Arkansas.

2.    At one time, there were seven railroad trestles on the section of track that runs Beebe, Arkansas and Ward, Arkansas.

3.    In 1972, a railroad trestle burned, and the railroad filled it in with a permanent embankment to support the track structure.

4.    At the time this trestle burned, Bud Guyot owned the land where the plaintiffs' houses are now located.

5.    In 1980, a second railroad trestle burned and the railroad filled it in with a permanent embankment.

9.    The issues of fact expected to be contested.

### RESPONSE NO. 9:

1.    Whether the actions of the railroad in operating and maintaining their railbed caused the water to be retained and back up onto plaintiffs property.

2.    Whether the railroad failed to maintain the drainage.

3.    Whether or not the closing of an active trestle in this area in 1972 effectively lowered the ability of the railbed and remaining trestles to drain the area adjacent to it effectively.

4.     Whether or not the closing of an existing trestle was a cause of the water being impounding and backing up into the Windwood Subdivision on a repeated basis in 2009 and 2011.

5.     Whether or not the closing of a second active trestle in this area in 1980 effectively lowered the ability of the railbed and remaining trestles to drain the area adjacent to it effectively.

6.     Whether or not the closing was a cause of the water backing up and flooding the Windwood Subdivision in 2009 and 2011.

7.     Whether or not the reduction in size of a third trestle in this area in 1996 lowered the ability of the railbed and remaining trestles to drain the area adjacent to it effectively.

8.     Whether or not the reduction was a cause of the water backing up into the Windwood Subdivision in 2009 and 2011.

9.     Whether or not Union Pacific Railroad monitored the drainage in this area so that the drainage required under A.C.A. §23-12-204 "effectively drained the expected runoff".

10.    Whether or not the collective closing of each of the two (2) trestles and a reduction of a third trestle was a violation of the statutory duty imposed by Arkansas law to be sure the area drained effectively

which was a cause of the water reaching plaintiffs property in 2009 and 2011.

11. Whether or not the collective closing of two (2) active trestles and the reduction in size of a third trestle out of seven (7) trestles draining this area was a cause of the trespass onto plaintiffs property in 2009 and 2011.

12. Whether or not the collective closing of two (2) trestles and reduction in size of one trestle out of seven (7) trestles is a violation of the railroad's duty to maintain effective drainage of all "maximum expected runoff" required by Union Pacific's requirements or regulations on monitoring drainage.

13. Whether or not Union Pacific Railroad maintained the railbed and trestle drainage in this area to accommodate the maximum expected runoff required by Union Pacific Railroad's operating rules?

14. Whether or not the drainage of the railbed in this area caused the water to accumulate and backup from the railbed onto and into the property of plaintiffs in October 2009.

15. Whether or not Union Pacific knew the drainage of the railbed in the area caused the water to accumulate and backup from the railbed onto and into the property of plaintiffs in December 2009.

16.     Whether or not Union Pacific knew the drainage of the railbed in this area caused the water to accumulate and backup from the railbed onto and into the property of plaintiffs in May 2011.

17.     Whether or not Union Pacific knowingly restricted the drainage in this area by not monitoring and maintaining adequate drainage.

18.     Whether or not Union Pacific knew that its actions were the cause of the flood and did it refuse the City of Beebe's request to reinstate the drainage trestles previously closed.

19.     Whether or not Union Pacific admitted to the City of Beebe that the closing of the trestles were the cause of the high water in the Windwood Subdivision in October 2009 and December 2009.

20.     Whether or not Union Pacific admitted to the Mayor of the City of Beebe that they could fix the drainage issues in the Windwood Subdivision by restoring the trestles previously taken out, if the City of Beebe paid $3 million dollars.

21.     Whether or not the damage to the homes of the plaintiffs was caused by the railroad's continuing failure to maintain and correct drainage issues to be sure the drainage met the statutory mandate to effectively drain its railbed.

22.   Whether or not the damage to the homes was caused by the railroad's duty to monitor this area to meet its own internal requirements regarding drainage of the railbed in question.

23.   Whether or not there are sufficient facts to show that plaintiffs are entitled to punitive damages.

24.   Whether or not the defendant knew or ought to have known that closing and the reduction of its drainage facilities and failing to monitor the drainage would naturally or probably result in injury and whether the defendant continued such conduct in reckless disregard of the consequences from which malice can be inferred.

25.   Whether or not the defendant knew of its initial closure and intended its act of filling in the openings to the trestles to be permanent.

26.   Whether or not plaintiffs' homes have diminished in value.

27.   Whether or not homeowners and possessors of the property can testify as to the value of their properties and values being reduced by the flooding of their respective homes.

28.   Whether or not Kay Winters partially repaired her home and is entitled to compensation for those repairs.

29.   Whether or not Kay Winters, as owner and occupier at the time of the floods, has standing to sue for damages to real property.

30.  Whether or not Greg Horness, as owner and occupier at the time of the flood, has standing to sue for damages to real property.

31.  Whether or not Greg Horness had, at the time of the flooding, damages created by the floods.

32.  Whether or not the attempts and production to discovery requests made by Keith Griffin complied with this Court's Order compelling discovery.

33.  Whether or not the defendant admitted that the drainage problem was being created by its conduct and could be repaired by defendant.

34.  Whether or not the defendant required that the City of Beebe pay them $3 million dollars to restore the drainage that had been closed by the defendant.

35.  Whether or not the defendant put their profits ahead of the safety of the plaintiffs and other citizens and residents in the Windwood Subdivision.

36.  Whether or not the closing of active trestles was a cause of the water backing up and flooding the Windwood Subdivision in 2009 and 2011.

37.   Whether or not Union Pacific Railroad monitored the drainage in this area so that the drainage required under A.C.A. §23-12-204 "effectively drained the expected runoff".

38.   Whether or not the collective closing of each of the two (2) trestles and a reduction of a third trestle was a violation of the statutory duty imposed by Arkansas law to be sure the area drained effectively which was a cause of the water reaching plaintiffs property in 2009 and 2011.

39.   Whether or not the collective closing of two (2) active trestles and the reduction in size of a third trestle out of seven (7) trestles draining this area was a cause of the trespass onto plaintiffs property in 2009 and 2011.

40.   Whether or not the collective closing of two (2) trestles and reduction in size of one trestle out of seven (7) trestles is a violation of the railroad's duty to maintain effective drainage of all "maximum expected runoff" required by Union Pacific's requirements or regulations on monitoring drainage.

41.   Whether or not Union Pacific Railroad maintained the railbed and trestle drainage in this area to accommodate the maximum expected runoff required by Union Pacific Railroad's operating rules?

41.    Whether or not Union Pacific knowingly restricted the drainage in this area by not monitoring and maintaining adequate drainage.

42.    Whether or not the damage to the homes of the plaintiffs was caused by the railroad's continuing failure to maintain and correct drainage issues to be sure the drainage met the statutory mandate to effectively drain its railbed.

43.    Whether or not the damage to the homes was caused by the railroad's duty to monitor this area to meet its own internal requirements regarding drainage of the railbed in question.

10.    The issues of law expected to be contested.

**RESPONSE NO. 10**:

1.    Whether Union Pacific directly or indirectly caused a trespass onto plaintiffs' property.

2.    Whether Union Pacific had a duty to maintain the drainage of their railbed.

3.    Whether Union Pacific had any duty to the people who were affected by the water imposed by the railroad railbed.

4.    Whether Union Pacific may put evidence in this trial of the history of FEMA and Beebe and the development of the subdivision to establish a defense to trespass of the properties.

5.    Whether Union Pacific may put into evidence in this trial of a history of FEMA, BFE and Beebe in development of the subdivision in defense to a negligence case involving its own drainage or lack of drainage.

11.    A list and brief description of exhibits, documents, charts, graphs, models, schematics, diagrams, summaries and similar objects which may be used in opening statement, closing argument or any other part of the trial whether or not they would be offered in evidence. Separately designate those documents and exhibits which the party expects to offer and those which the party may offer.

**RESPONSE NO. 11**:   Plaintiff's exhibits will include: photographs and diagrams used by the parties during depositions which will be in evidence.  See attached exhibit list.

12.    The names, addresses and telephone numbers of the witnesses for the party.   Separately identify witnesses whom the party expects to present and those whom the party may call.   Designate witnesses whose testimony is expected to be presented via deposition and, if not taken steno graphically, a transcript of the pertinent portion of the deposition testimony..

**RESPONSE NO. 12**:   See attached witness list.

13.   The current status of discovery, a precise statement of the remaining discovery and an estimate of the time required to complete discovery.

**RESPONSE NO. 13**:   Discovery is complete; plaintiff is ready for trial.

14.   An estimate of the length of the trial and suggestions for expediting deposition of the action.

**RESPONSE NO. 14**:   One (1) week to seven (7) days.


Respectfully submitted,

/s/ **James F. Swindoll**
Bar Number 77131
Attorney for Plaintiff
Law Offices of James F. Swindoll
212 Center Street, Suite 300
Little Rock, Arkansas  72201
(501) 374-1290
E-mail: jswindoll@swindolllaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

Mr. Joseph P. McKay
Mr. Travis J. Flower
**Friday, Eldredge & Clark, LLP**
Attorneys at Law
400 Capitol Ave., Suite 2000
Little Rock, Arkansas  72201

/s/ **James F. Swindoll**
Bar Number 77131
Attorney for Plaintiff
Law Offices of James F. Swindoll
212 Center Street, Suite 300
Little Rock, Arkansas  72201
(501) 374-1290
E-mail: jswindoll@swindolllaw.com

AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | ARKANSAS |

| DERRICK SEYMORE, et al | **EXHIBIT AND WITNESS LIST** |
| V. | |
| UNION PACIFIC RAILROAD CO | Case Number: 4:10-CV-00239 BSM |

| PRESIDING JUDGE<br>Brian S. Miller | PLAINTIFF'S ATTORNEY<br>James F. Swindoll | DEFENDANT'S ATTORNEY<br>T.J. Fowler & Jospeh McKay |
|---|---|---|
| TRIAL DATE (S)<br>9/12/2011 - 9/17/2011 | COURT REPORTER | COURTROOM DEPUTY |

| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | | | | Bud Guyot |
| | | | | | Phil McKenna-designates the entire video taped deposition - transcript is attached |
| | | | | | Donald E. Beavers |
| | | | | | Randy Richardson |
| | | | | | Mike Robertson |
| | | | | | Milton McCullar |
| | | | | | Mike Borngasser |
| | | | | | Bill Thompson |
| | | | | | |
| | | | | | PLAINTIFFS: |
| | | | | | Derrick Seymore |
| | | | | | Anita Seymore |
| | | | | | Shane Smith |
| | | | | | Kay Winters |
| | | | | | Brian Parker |
| | | | | | Stephanie Parker |
| | | | | | Keith Griffin |
| | | | | | James Taylor |
| | | | | | Norma Taylor |
| | | | | | Gene Adams |
| | | | | | Emma Adams |
| | | | | | Connie Kirby |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

AO 187A (Rev. 7/87)

# EXHIBIT AND WITNESS LIST – CONTINUATION

| DERRICK SEYMORE, et al | | | | vs. | UNION PACIFIC RAILROAD CO | CASE NO.<br>4:10-CV-00239 BSM |
|---|---|---|---|---|---|---|

| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | | | | | Stewart Kirby |
| | | | | | Gregory Horness |
| | | | | | Anthony Healy |
| | | | | | Sherry Healy |
| | | | | | Linda Crider |
| | | | | | Jonathan Gordon |
| | | | | | Renee Gordon |
| | | | | | Brian Stroud |
| | | | | | Jeffrey Mesko |
| | | | | | Sara Mesko |
| | | | | | Plaintiffs may call the following: |
| | | | | | Tony Hicks |
| | | | | | Terry Russell |
| | | | | | Matt Mears |
| | | | | | Omar Herrera |
| | | | | | Randy Golden |
| | | | | | Chris Colclasure |
| | | | | | Bo Findley |
| | | | | | any and all witnesses listed by the defendant |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Phillip McKenna                                                    July 14, 2011

---

1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DERRICK and
ANITA SEYMORE, et al., )
                        )
      PLAINTIFFS,       )  DEPOSITION OF
                        )  PHILLIP MCKENNA
        VS.             )
                        )
UNION PACIFIC RAILROAD.)
                        )
      DEFENDANT.        )
                        )
------------------------

DEPOSITION OF PHILLIP MCKENNA, taken
before Leslie B. Anderson, Stenographic Court
Reporter, General Notary Public within and for the
State of Nebraska, beginning at 9:00 a.m., on
July 14, 2011, at the Hilton Garden Inn, 1005 Dodge
Road, Omaha, Nebraska pursuant to the Nebraska
Supreme Court rules.

---

3

1           I N D E X
2   CASE CAPTION ...........................Page  1
    APPEARANCES ...........................Page  2
3   INDEX ..................................Page  3
    TESTIMONY ..............................Page  5
4   REPORTER CERTIFICATE ...................Page 126
5   DIRECT EXAMINATION:
      By Mr. Swindoll .....................Page  5
6
    CROSS-EXAMINATION:
7     By Mr. McKay ........................Page 100
8   REDIRECT EXAMINATION:
      By Mr. Swindoll .....................Page 119
9
    RECROSS EXAMINATION:
10    By Mr. McKay ........................Page 124
11  EXHIBITS:
12  1. Engineering Track Maintenance
13     Field Manual excerpt.................Page  58
14  2. Google map............................Page  50
15  3. Profile map...........................Page  59
16  4. Bridge 411E & 411W....................Page  68
17  5. Bridge 413-A E&W......................Page  71
18  6. UP 001393.............................Page 102
19  7. Photograph............................Page 102
20
21
22
23
24
25

---

2

1         A P P E A R A N C E S
2   FOR THE PLAINTIFFS:
    MR. JAMES F. SWINDOLL
3   LAW OFFICES OF JAMES F. SWINDOLL
    212 Center Street
4   Suite 300
    Little Rock, Arkansas 72201
5   (501) 374-1290  FAX (501) 374-3857
    jswindoll@swindolllaw.com
6
    FOR THE DEFENDANT:
7   MR. JOSEPH P. McKAY
    FRIDAY, ELDREDGE & CLARK, L.L.P
8   400 West Capitol Avenue
    Suite 2000
9   Little Rock, Arkansas 72201-3522
    (501) 370-1497  FAX (501) 244-5326
10  jmckay@fridayfirm.com
11        A L S O  P R E S E N T
12  Jay Rollins, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25

---

4

1             THE VIDEOGRAPHER:  This is the
2   videotaped deposition of Phil McKenna being taken
3   by the plaintiff in the case entitled, In the
4   United States District Court, Case No. 4:10-CV-239
5   BSM; Seymore, et al, Plaintiffs versus Union
6   Pacific Railroad, Defendant.  This deposition is
7   being held at the Hilton Garden Inn, 1005 Dodge
8   Street, Omaha, Nebraska.  Today's date is July 14th
9   of the year 2011.  The approximate time is 9:04
10  a.m. My name is Jay Rollins, videotape specialist;
11  the court reporter is Leslie Anderson, both in
12  association with Esquire Deposition Services.
13           Would counsel please introduce themselves
14  for the record.
15           MR. SWINDOLL:  I'm James Swindoll.
16  I'm here for the homeowners.
17           MR. McKAY:  Joe McKay on behalf of
18  the defendant, Union Pacific Railroad.
19           THE VIDEOGRAPHER:  You may swear the
20  witness.
21           (Whereupon, the following proceedings were
22  had, to-wit:)
23           PHILLIP McKENNA,
24           having been first duly sworn,
25  was examined and testified as follows:

---



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                              July 14, 2011

5

1          DIRECT EXAMINATION
2     BY MR. SWINDOLL
3         Q.  Good morning, Mr. McKenna.  Would you give
4     us your full name, please.
5         A.  Phillip Arthur McKenna.
6         Q.  Okay.  Mr. McKenna, would you give us your
7     current position with the Union Pacific, please.
8         A.  Yes.  I am a bridge scheduler.
9         Q.  Okay.  And how long have you held that
10    position?
11        A.  Since Valentine's Day of this year, so
12    February -- actually, the 15th.
13        Q.  Could you give us a feel for what your job
14    duties are?
15        A.  Yes, sir.  Basically at this point, I
16    schedule all bridge construction, bridge rehab,
17    metro projects that involve bridges, capacity
18    projects that involves bridges.  Basically,
19    anything that is a bridge construction or
20    reconstruction project I schedule so that it can be
21    laid out in an order that makes logical sense; it
22    doesn't interfere with other projects on the
23    railroad by other groups, and also is in line with
24    fabrication times on larger objects that are long
25    lead time.

6

1         Q.  Okay.  Does that include -- you say
2     bridges.  Does that include trestles that we've
3     been talking about?
4         A.  "Trestles" is more of an archaic term for
5     a wooden structure.
6         Q.  Okay.
7         A.  We build very few.  We do a lot of
8     maintenance-type rebuilds particularly in the areas
9     of new decking across it where a situation has
10    occurred where it needs a re-deck for one reason or
11    another, or even the ties or upgrading the
12    foot-walk and handrail is done on trestles at this
13    point; but as far as building new trestles, that's
14    no longer a UP standard as far as your -- the
15    normal -- the normal person's outlook would be as a
16    trestle is a wooden structure.
17        Q.  If I use the term "bridges" today, that
18    can include the trestles that we'll be talking
19    about --
20        A.  Yes, sir.
21        Q.  I assume that it can be communicated --
22        A.  Yes, sir.
23        Q.  -- that way, right?
24        A.  Yes, sir.
25        Q.  What's the purpose of a bridge or a

7

1     trestle?
2         A.  The purpose -- the primary purpose is to
3     convey the live load of the train across an object
4     that the train would not normally be able to
5     negotiate over a standard fill section.
6         Q.  Does it have any role with respect to
7     drainage --
8         A.  Some do, some do.  Some are over roads.
9     Some are over canyons; but, yeah, some do carry
10    drainage.
11        Q.  And when you have a bridge or a trestle
12    that controls drainage, do you monitor that bridge
13    to be sure that it adequately drains the area that
14    it's supposed to?
15        A.  Yes.
16        Q.  How do you do that, sir?
17        A.  In this position, I don't.  As -- in
18    previous positions when I was out in the field,
19    there are requirements that the bridges be
20    inspected both by the bridge inspectors whose
21    primary function is checking the bridges, and the
22    managers both of track and of structures for
23    maintenance also have a joint ride annually over
24    those structures.  And part of their duty --
25    there's other duties there too that are listed, but

8

1     part of that duty is to look at the bridge
2     structure and identify any that may be obstructing
3     drainage.
4         Q.  Okay.  Now, are the inspectors the ones
5     that the railroad relies upon to determine if
6     drainage issues exist around a track?
7         A.  They're both -- that's a two-part
8     question, actually, whether you realize it --
9     there's bridge inspectors and track inspectors.
10        Q.  Uh-huh.
11        A.  Both of them have some responsibility in
12    that area, yes.
13        Q.  And if I understand, the process is they
14    do the inspection and they record it, or they
15    report it upstream to the bridge maintenance guys?
16        A.  The bridge inspectors report to the --
17    produce a report to the bridge maintenance manager,
18    yes.
19        Q.  Okay.
20        A.  The track inspectors report to their
21    respective manager, and then if there is an issue
22    involving a bridge, they would communicate with the
23    bridge manager.
24        Q.  Okay.  How important is drainage to the
25    Union Pacific?



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                        July 14, 2011

**9**

1    A.  Well, extremely.
2    Q.  Why is that so?
3    A.  The primary concern with drainage on any
4  railroad is keeping the -- the roadbed dry.
5    Q.  Right.
6    A.  The subbase can saturate.  The ballast can
7  then become contaminated by mud pushing up into it
8  that will hold water, create a bathtub around each
9  individual railroad tie, which will cause premature
10  failure of the tie.  It can cause the soil in that
11  area to soften where you get a low spot in your
12  track.  And, of course, there's federal regulations
13  on how much -- how fast, actually, you can run over
14  low spots, so it's a huge concern to keep the
15  roadbed drained properly.
16    Q.  Okay.  Before your current position, I
17  understand that you worked in the area that we're
18  discussing in this lawsuit; is that correct, sir?
19    A.  Yes.
20    Q.  Tell us about your position, then.
21    A.  I was manager of bridge maintenance
22  southern region for the Little Rock service unit
23  for roughly two years.  During that time, that
24  territory included all of Arkansas, part of
25  Tennessee, part of Missouri, a small piece of

**10**

1  Texas, and a small piece of Louisiana.
2    I was the primary -- primary manager, I
3  guess, of all the maintenance gangs and activities
4  and including not only the day-to-day maintenance
5  but the planning for future years as to which
6  bridges were nearing the end of their service life
7  and needed to be planned in the next five to ten
8  years for upgrades or replacement.
9    Q.  Tell me a little bit about how the
10  railroad evaluates the service life of a bridge.
11    A.  That's a tough question.  The bridges are
12  all pretty much designed for a, quote, hundred-year
13  life.
14    Q.  Uh-huh.
15    A.  That's from the design end.  Various
16  factors can affect how they actually perform; the
17  primary one being what we haul over it.  A bridge
18  that would carry, say, 50 coal trains a day which
19  are pretty much the heaviest we carry, is going to
20  degrade much more quickly than one on a branch line
21  that sees something -- maybe two trains a week
22  loaded with corn and plastic beads.
23    Q.  Okay.  This is a Class 5 track in the
24  area --
25    A.  Yes, it is.

**11**

1    Q.  -- that we're talking about?
2    A.  Yes.
3    Q.  Somebody's called it the hoxie
4  subdivision.
5    A.  It is on the hoxie subdivision, yes, sir.
6    Q.  We'll be looking at -- in the area between
7  mile marker 310 and 320; are you familiar with that
8  area, sir?
9    A.  I am.
10    Q.  That's the area that we're talking about
11  in this lawsuit.  Are you familiar with what the
12  complaints are in this lawsuit?
13    A.  I am.
14    Q.  Okay.  Now, are you trained as an
15  engineer?
16    A.  Yes, sir.
17    Q.  Did you actually get an education as and
18  have an engineering degree?
19    A.  I do --
20    Q.  Okay --
21    A.  -- I have a --
22    Q.  -- are you a professional engineer?
23    A.  No.  I went into bridge construction right
24  out of school; took the, quote, engineering
25  training exam, passed that, and then the areas of

**12**

1  bridges that I went into really never required
2  taking the professional engineer's exam, so I never
3  followed through and got that.
4    Q.  All right.
5    A.  And, of course, at this age in life,
6  that's a regret.  I probably should have and may
7  one day need to, but my position at present, it's
8  certainly not a requirement of any type and, you
9  know, studying for it would take a fair amount of
10  time at this point.
11    Q.  Do you know what AREMA is?
12    A.  Yes, sir.
13    Q.  What is AREMA?
14    A.  Oh, boy.  The --
15    Q.  It's an acronym.  We can agree on that.
16    A.  Yeah.  It's an acronym for railroad
17  engineering -- is it American Railway Engineering,
18  et cetera, et cetera, but it's the group that
19  covers the design and maintenance of basically the
20  trackway -- not the cars and rolling stock and all
21  that.  Basically the track beds, the structures,
22  that sort of thing.
23    Q.  Do they have standards that you use in
24  your job in redesigning and building bridges, sir?
25    A.  Yes, they do.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                      July 14, 2011

13

1    Q.  Would they be called the industry
2  standard?
3    A.  Sure.
4    Q.  Okay.  Do they address drainage as well as
5  the UP procedures manuals?
6    A.  Yes.
7    Q.  Okay.  Did -- are you a member of AREMA?
8    A.  Not at this point.  I have been, but I do
9  not have a current membership.
10   Q.  Okay.  In your training as engineer, how
11 important was safety?
12   A.  Safety is one of the key things for
13 engineers.  Our prime purpose -- people trust
14 engineers.  As you drove here today, you rode over
15 several bridges, and you assumed that they were
16 still there in the morning --
17   Q.  Uh-huh.
18   A.  -- that they weren't there just yesterday
19 afternoon as you went home.  We -- the population,
20 in general, trusts engineers that they will design
21 things safely and maintain them safely.
22   Q.  In fact, can we agree that safety is
23 paramount in engineering?
24   A.  Absolutely.
25   Q.  Is safety paramount with the Union

14

1  Pacific?
2    A.  Oh, absolutely.
3    Q.  Now, we mentioned earlier that water up
4  against the rail bed can create danger to the
5  railroad route?
6    A.  It can.
7    Q.  It can, and I think you even described
8  some of how the water can permeate the bed and
9  create an instability, which is what you want to
10 avoid?
11   A.  Exactly.
12   Q.  Okay.  Can it also create water that backs
13 up off the rail bed if it doesn't drain properly?
14   A.  It can.
15   Q.  Is that a concern for Union Pacific when
16 it occurs?
17   A.  Yes.
18   Q.  How is that concern addressed by Union
19 Pacific as you understand it?
20   A.  Depends on the area, unfortunately.
21   Q.  Okay.
22   A.  Yes, we're concerned anytime water gets up
23 high enough to get into what we call the ballast.
24 We generally try to avoid that.  There are some
25 places you can do nothing about it.  For example,

15

1  in Watsonville, California, when the tides get
2  high, the rail is overtopped every time.  This
3  happens six to seven times a year.
4    Q.  Right.
5    A.  It's a wetlands protected by some law in
6  California that we can't do anything about it.
7  We're not allowed to raise the track.  We're not
8  allowed to do anything with it, so three to five
9  times a year, they go out there and protect the
10 track, believe it or not, with big sheets of black
11 plastic to allow it to run over the track and let
12 it drain out naturally, and pick the plastic back
13 up and resume operations.  That's a bizarre
14 situation.
15   Q.  Okay.
16   A.  On the other hand, for the most part,
17 there's areas in Louisiana where it stays saturated
18 where we cross miles and miles of swamp.  We can't
19 do anything about that.  If it's an area we can do
20 something, maybe we take a look at it and see what
21 we can do.  There's places here in Omaha right now
22 where we've got a flooding situation where we're
23 raising the track.
24   Q.  Are there any situations where you have
25 that drainage problem where UP might add a trestle

16

1  or a bridge in order increase the drainage from one
2  side of the track to the other?
3    A.  Yes.  We would do a hydrology study, a
4  formal one, and if a -- if the study recommends
5  more opening in the railroad fill would alleviate
6  the problem, yes, that would be done.
7    Q.  Okay.  Now, earlier when you described the
8  water level up against the track and you used the
9  term "ballast"?
10   A.  Yes.
11   Q.  I think I now know what ballast is --
12   A.  Right.
13   Q.  -- but would you explain to us what
14 ballast is and what that level really is on the
15 track?
16   A.  Certainly.  "Ballast" is a railroad term
17 for what people think of as those rocks that you
18 see all around railroad tracks.  There's several
19 grades; there's D, C, et cetera.  We're not gonna
20 -- that's not really relevant at this point, but
21 the ballast is basically -- performs three
22 functions.  It supports the ties; it prevents the
23 ties from moving, and it allows drainage of water
24 away from the ties.  Those are its three prime
25 functions.



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                              July 14, 2011

17

1    Q.  Is ballast all the way up the rail -- the
2  rail bed to the top of the track --
3    A.  Negative.
4    Q.  -- all the way down to the ground?
5    A.  Negative.
6    Q.  Okay.
7    A.  No, the ballast is level with the top of
8  the ties.  The rail sits on a steel plate on top of
9  the ties, and then on top of that steel plate is
10  the base of the rail, and then there's the
11  fastening system and all that.
12    Q.  Okay.  So the ballast is actually above
13  the rocks that we've been talking about or just
14  those rocks the rails sit on?  I'm not really
15  clear.
16    A.  The rails don't sit on it; the ties do.
17    Q.  Okay.
18    A.  The ties do.  The ballast surrounds the
19  ties.  There are minimum depths for that ballast
20  depending on the type of tie used.
21    Q.  Okay.  So with that understanding, how
22  high can the water get before it becomes a concern
23  against the rail bed, sir?
24    A.  Depends on whether it's continuous water
25  or occasional water.

18

1    Q.  Okay.
2    A.  We never want continuous water to the
3  bottom of the ballast.
4    Q.  Okay.
5    A.  It becomes a concern if it's occasional
6  water like due to a major, out-of-the-ordinary
7  storm or tides in California, whatever the problem
8  may be.  When it actually approaches the bottom of
9  the tie, which is higher than the bottom of the
10  ballast, their -- the height varies depending on,
11  like I said, on the type of tie; but once it starts
12  to approach the bottom of the ties, you start
13  getting a buoyancy factor because primarily our
14  ties are wood.
15    Q.  Uh-huh.
16    A.  They aren't all -- there's plastic, steel,
17  and concrete ties out there, but primarily the wood
18  ties and the plastic ties will actually start to
19  produce a buoyancy factor as that water gets up to
20  them, which reduces the ability of our track to
21  carry load.
22    Q.  What about occasional?  We kind of talked
23  about it --
24    A.  Sure.
25    Q.  -- at another time.  If the water

19

1  occasionally reaches that level, are you concerned?
2    A.  We're concerned, yes.
3    Q.  Would you expect that your inspectors
4  would be the ones who would report that back to the
5  system so the system can look at it?
6    A.  Yes.
7    Q.  Okay.  In fact, the eyes and ears of UP,
8  with respect to water levels up against the track,
9  are the inspectors themselves?
10    A.  Yes, sir.
11    Q.  In fact, they're mandated by federal law
12  to inspect this and report back to you, aren't
13  they?
14    A.  Yes.  That's an FRA requirement.
15    Q.  You used the term "FRA," and in a
16  minute -- and I'm going to use that later.  Tell us
17  what that is.
18    A.  Federal Railroad Administration.  They are
19  a federal agency that governs with various sections
20  of code or law, however you want to describe it,
21  how to operate, how to maintain your railroad.
22    Q.  So we've talked about federal -- FRA --
23    A.  Yes.
24    Q.  -- Federal Railway Administration.  We've
25  talked about AREMA --

20

1    A.  Yes, sir.
2    Q.  -- and we've talked about the UP
3  standards?
4    A.  Yes, sir.
5    Q.  Okay.  What I'd like to do before we go
6  much further, is just be sure that we're talking
7  about the same standards.
8    A.  Certainly.
9    Q.  I'm going to show you -- I copied some
10  pages from the productions in this case, and I'm
11  going to show you three pages, UP 30 -- 3 -- 369, I
12  guess, 370 or 388, 3 -- anyway, look at these for a
13  second, if you can.  This is the manual itself that
14  I was provided in discovery; and, first, let's ask
15  what the Engineering Track Maintenance Field Manual
16  is?
17    A.  This book is a, basically, a list of
18  rules, if you will, or -- and procedures and
19  information on how to maintain railroad tracks.
20    Q.  Okay.
21    A.  That's its primary function.
22    Q.  Okay.  And I have taken the next page
23  of -- Page 2 of it and that's the Union Pacific --
24  Page 370.  It talks about the FRA in the third
25  paragraph.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                              July 14, 2011

21

1    A.  Certainly.
2        Q.  Okay.  It says on "...the legal minimum
3    requirements to which the track structure
4    is...maintained and...be complied..."
5        A.  That's correct.
6        Q.  When you're maintaining the track
7    structure, does that include drainage?
8        A.  Yes.
9        Q.  Now, I've taken the liberty to go into
10   Section 1.2.
11       A.  Uh-huh.
12       Q.  Engineering Track Manual, Roadbed, and 1.2
13   is "Drainage."  Are you familiar with this
14   provision?
15       A.  I certainly am.
16           MR. SWINDOLL:  Okay.  Let's mark
17   this -- these three pages as Exhibit 1 to the
18   deposition.
19   BY MR. SWINDOLL:
20       Q.  It says -- read with me for a minute here.
21   I want to ask you about -- rail -- rail -- "Roadbed
22   drainage is the most important component of good
23   track maintenance.  To a achieve proper drainage
24   that diverts water away from the track, either
25   direct the water parallel to...or across the

22

1    roadbed, and intercept and divert the water before
2    it reaches the roadbed."  Could you tell us what
3    that means from the position of a person at UP who
4    might know?
5        A.  In other words, translate that into
6    English?
7        Q.  Please.
8        A.  As I alluded to before, keeping the ties,
9    the roadbed, the sub-ballast, all of that in a dry
10   and unsaturated and drained condition is an
11   extremely important factor in prolonging the
12   service life and the stability of the track.
13       Q.  Now, a question I had as I was thinking
14   about our deposition this morning, you've mentioned
15   now that the level that you're really concerned
16   about is at the ballast?
17       A.  That's correct.
18       Q.  That's usually above the level of a
19   bridge, isn't it?  Isn't that above the --
20       A.  No.
21       Q.  -- ballast?
22       A.  No, no.
23       Q.  Okay.
24       A.  Depending on the type of bridge -- there's
25   more types of bridges than we want to get into --

23

1        Q.  Right.
2        A.  -- but the level of the bridge is above
3    the ballast.  Generally, the level of the bridge is
4    base of rail.
5        Q.  Okay.
6        A.  So that's slightly above ballast level.
7        Q.  Okay.
8        A.  Now, we do have, quote, ballast-deck
9    bridges where the bridge is lower and is
10   essentially a bathtub -- a very strong bathtub on
11   stilts.
12       Q.  Uh-huh.
13       A.  If -- and that bridge is definitely lower
14   because we have to meet that minimum depth of
15   ballast from -- instead of a raided roadbed of
16   drained material, we are on a, basically, a wooden
17   table with sides to contain the ballast.
18       Q.  Uh-huh.
19       A.  So that type of bridge, the, quote, actual
20   surface deck of the bridge is below the ballast.
21       Q.  Okay.
22       A.  That would be a correct statement.  For
23   other types, trusses, through-plate girders,
24   deck-plate girders, you know, I can go on and on
25   and on.  There's hundreds of types of bridges, and

24

1    you can see that if you just drive around town; but
2    a ballast-deck bridge, it would be below; the rest
3    it would be above.
4        Q.  Does UP ever want the water to be above
5    the trestle on the bridge as it comes up against
6    the water?
7        A.  Generally, no.
8        Q.  Okay.  Why is that?
9        A.  Well, for one thing, if it's overtopping a
10   bridge --
11       Q.  Uh-huh.
12       A.  -- there are, in the same field manual --
13   actually, no, it's in the other book.  There are
14   rules about how much water you can run over with a
15   locomotive.
16       Q.  Right.
17       A.  And those are UP rules, and you generally
18   don't want to run a locomotive through a certain
19   amount of water, A, because the motors actually on
20   those that drive them are electric motors.  They're
21   nothing more than a huge generator that powers
22   enormous electric motors, and electric motors and
23   water don't mix; and, two, you can't see if a
24   portion of that bridge when you're driving over it
25   in a locomotive is missing, if it's all just water,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                    July 14, 2011

25

1    so those are undesirable conditions. They're not
2    safe.
3         Q.   I want to go back to our consideration for
4    a minute and ask, "To achieve proper drainage that
5    diverts water away from the track, either direct
6    the water parallel to and/or across the roadbed --"
7         A.   Sure.
8         Q.   What does that mean?
9         A.   Well, that's a two-part question,
10   obviously.  Directing the water parallel to the
11   trackway --
12        Q.   Uh-huh.
13        A.   We have a standard section also contained
14   in this field manual that shows this is the slope
15   of the ballast, this is the slope of the
16   sub-ballast, this is the slope you'll put on fill,
17   and at the bottom of that is a ditch.
18        Q.   Uh-huh.
19        A.   The ditch will have a grade to carry water
20   away from the structure, the rail structure itself,
21   so that would be the parallel part.
22        Q.   Okay.
23        A.   Now, conveying it across?  That's done in
24   several different ways.
25        Q.   Okay.

26

1         A.   The most basic would be at a railroad
2    crossing where you've got pavement all around.
3    You've got either wooden planks, concrete planks,
4    or rubber planks across the tracks where the cars
5    drive; and a lot of times, if you look off either
6    end, you'll see between the ties, we have dug out
7    the ballast between one -- the first tie to allow
8    water to pass that comes off that crossing and get
9    away from our tracks rather than go down the
10   tracks.  That's the most basic.
11        Q.   Okay.
12        A.   The next step up would be putting a
13   culvert.
14        Q.   Okay.  Let's talk about culverts for a
15   minute --
16        A.   Sure.
17        Q.   In other construction cases, I know what a
18   culvert is.  How's a culvert used with a UP system?
19        A.   Culvert is basically to convey only a
20   water flow underneath the roadbed.
21        Q.   Okay.
22        A.   Transverse, it can be skewed or at a 90
23   degree depending on what the orientation of the
24   stream bed was when they put the culvert in.  Many
25   of these -- many of our fills are rather old, from

27

1    the 1800s, and the culverts that were originally
2    put in there follow the alignment of a stream when
3    they put the railroad fill -- fill in back the
4    1800s.
5         Q.   Is there a difference between a culvert
6    and a trestle?
7         A.   Oh, yeah.
8         Q.   Okay.
9         A.   There's actually federal definitions.
10        Q.   Okay.
11        A.   Yeah, culverts, basically, cannot span an
12   opening more than 10 feet.  Anything more than
13   10 feet is considered a bridge or, the term you're
14   using, a "trestle."
15        Q.   Okay.
16        A.   That's a federal -- right out of the FHWA
17   manual, right there.  It's chapter one.
18        Q.   The trestles and the bridges that we'll be
19   talking about in this area from 310 to 320, what is
20   their primary purpose?
21        A.   To carry the train across different -- I
22   think in that case, they're all water-flow
23   instances, so it's to carry the train safely across
24   a flow of water whether it be intermittent or
25   constant.

28

1         Q.   And has that historically been what
2    railroads use trestles for?
3         A.   Well, like I said earlier, that's one of
4    them.
5         Q.   Yeah.
6         A.   We cross canyons out west --
7         Q.   Right.
8         A.   -- and some of those trestles are
9    enormous.
10        Q.   In this area, looking at it, can you say
11   with any confidence that the trestles were really
12   designed to move the water from one side of the
13   track to the other?
14        A.   In the area we're talking about, that
15   would be a valid statement.
16        Q.   Okay.  Now, what is required to close a
17   trestle?  How do y'all do that?
18        A.   It depends on the situation.
19        Q.   Okay.  Well, let's just talk about closing
20   the trestles.  That's just one of the things we'll
21   be talking about --
22        A.   Sure.
23        Q.   -- this week.
24        A.   Well, as the manager of bridge
25   maintenance, I could go out there and see something



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Phillip McKenna                                      July 14, 2011

29

1  that's unsafe for train passage, and all I gotta do
2  is make one phone call, it's out of service.
3      Q.  Okay.
4      A.  You know --
5      Q.  That means that trains don't go over?
6      A.  That means nothing goes over -- not
7  trains, not maintenance equipment, nothing.  And if
8  it's over a roadway, nothing goes under it.
9      Q.  Okay.
10     A.  So, you know, that's -- that's the very
11 basic definition of "closed" to me.
12     Q.  Okay.
13     A.  Now, obviously, if it's over the
14 Mississippi River and I close it, water and barges
15 are still going under that.
16     Q.  Right.
17     A.  Right.  In these smaller cases, again,
18 water will still flow under it even if I close the
19 bridge.
20     Q.  What is required from you before you can
21 fill in a trestle or close one completely so that
22 it no longer transfers water from one side of the
23 track to the other?
24     A.  Okay.  That's a different -- that's
25 more -- remove a trestle as opposed to closing it.

30

1      Q.  Okay.
2      A.  To remove it, I would have to call
3  engineering design in Omaha and tell them I've got
4  a situation here where I need to remove this, and
5  they will sit there and say, Okay, give me this
6  information, this information, et cetera.  We'll
7  call you back.
8         At that point, if it's an emergency
9  situation where -- well, everybody knows the
10 difference of emergency versus planned.  Generally,
11 they will, at that point, pull out the existing
12 hydraulic study for the area --
13     Q.  Uh-huh.
14     A.  -- look at it, and take the lowest
15 frequency flood that's listed in the study.  And I
16 don't know if you've looked at a lot of these, but
17 some of them have five-year flood intervals, some
18 have ten, some have 25.  They all have 25, 50 and
19 100; that's normal.  We will take the lowest one
20 there and say, Okay, if you're taking this out of
21 service, we need to fill it in and you need to do
22 it now.  Take the lowest interval, which may be,
23 say it was a ten-year, that's what we need to
24 provide for, and they look up, Okay, for ten years,
25 you need to put in two 96-inch pipes to carry that

31

1  water until we can design a new structure --
2      Q.  Okay.
3      A.  -- or if the hydrology study says you
4  don't even need it, fill it in, that happens; we
5  fill it in.  If it says you need an enormous amount
6  of bridge in that area, we've got one in Peoria,
7  Illinois right now that's that way.  I think we put
8  in something like 38 40-inch pipes -- 48-inch pipes
9  until we can get a new bridge put in there, so it
10 all depends on the hydrology study that's sitting
11 in Omaha at the time and they just design -- they
12 pick the lowest one simply because that would be
13 the amount of time it takes -- the chances of it --
14 it takes about three years to get a bridge through
15 the process between design, permitting, et
16 cetera --
17     Q.  Uh-huh.
18     A.  -- from when you identify you need one to
19 when you actually go out and put one in service.
20     Q.  Okay.
21     A.  So the ten-year flood is three times the
22 interval, roughly, of the three years it takes to
23 replace it; and then in some instances, like I
24 said, there's no need to.  The drainage in the
25 area's changed, whatever has happened, the study

32

1  shows you don't need it, just fill it in and go.
2      Q.  There's a couple terms you've used, and it
3  may be that this will be the first time the jury
4  hears "hydrology" from someone who might know what
5  it is.
6      A.  Oh, sure.
7      Q.  Tell us what that is.
8      A.  Hydrology -- there's two studies we do on
9  every bridge.  I guess I need to back up a little
10 because engineers tend to assume everybody knows
11 their business.  Hydrology is the study of how
12 water concentrates and flows during a rain event,
13 and it takes into consideration the area, the
14 topography, something called roughness coefficient,
15 time of concentration, et cetera.  All these
16 factors go into the hydrology study done for every
17 bridge, and basically they tell you, Okay, your
18 bridge is at this point.  This will be the expected
19 flow, this will be the expected height of the water
20 at that level.
21     Q.  Okay.  So help me.  I'm --
22     A.  Uh-huh, uh-huh.
23     Q.  Does the hydrology study then show how
24 high the water's gonna get and the railroad
25 takes -- I'm paraphrasing to see --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna
July 14, 2011

33

1    A.  Sure, sure, sure.  No, go ahead.
2    Q.  Does the hydrology study show you what the
3  water can be and the interval you've discussed --
4    A.  Uh-huh.
5    Q.  -- and then the UP takes that and decides
6  what to do with that information?
7    A.  Correct.  Our general policy in the design
8  group is we take the hundred-year flood and add two
9  feet to it for the bottom of our structure.
10    Q.  Okay.
11    A.  That's current design practice.
12    Q.  Okay.  And the "bottom" of the structure
13  is another term that I don't -- I don't know --
14    A.  Sure.
15    Q.  -- what that means when the railroad's
16  this high and not --
17    A.  Well, and that is -- that is another
18  situation.  The bottom of the structure is
19  generally the -- for the type of bridges we're
20  dealing with here, is the bottom of either the
21  wooden stringer or, in the ones that have been
22  replaced in that area, the bottom of the precast
23  concrete segment that spans the waterway.
24    Q.  Okay.  So the bottom of a stringer might
25  represent a hundred-year flood?

34

1    A.  No.  Well --
2    Q.  Can I say that that easily?
3    A.  No, not anymore.  Nowadays we do it, it's
4  two foot plus.
5    Q.  Okay.
6    A.  So if the elevation of the hundred-year
7  flood is, say, 50 feet, we would put the bottom
8  stringer elevation at 52 --
9    Q.  Okay.
10    A.  -- unless there's something that prevents
11  that --
12    Q.  Okay.
13    A.  -- and that can be the fact that right
14  here is our bridge; here is the highway overpass.
15  We don't own that overpass, and if we raise this to
16  here, the train won't fit.
17    Q.  Right.
18    A.  So that can be a governing factor that
19  would cause us to say, We gotta go outside our
20  normal design policy on this.  What we might look
21  at there is, Okay, if we open up the bridge
22  considerably and keep it at the lower level, how
23  will that affect the water level for the
24  hundred-year floods?  We go back to the hydrology
25  study and look at that.  Can we do that?  Will it

35

1  matter?
2    Q.  Uh-huh.
3    A.  Some cases it doesn't.  Some cases you
4  could open it up like so it's -- like some of our
5  bridges over the swamps in Louisiana, they're miles
6  and miles and it doesn't do any good.
7    Q.  Typically, in the past, maybe you know and
8  maybe you don't about historically, have they built
9  the railbeds at the hundred-year flood level --
10  what they understood to be the hundred-year flood,
11  if you know this?  I mean --
12    A.  Well, I don't know if I know it a hundred
13  percent because the railroad, as it sits now, Union
14  Pacific is made up of many railroads that we
15  acquired.  Some of their design policies were more
16  stringent than others.  To make a broad statement
17  and say every track we have is above the
18  hundred-year flood would be an out-and-out
19  falsehood.  It's just not the case.
20    Q.  Right.
21    A.  And I really can't attest to what the
22  individual railroads that we've acquired over the
23  years did.  Some of them were trial and error.
24  Well, we built it this high and it washed out;
25  let's add five feet.

36

1    Q.  Got it.  Now, the hydrology studies, as
2  you mentioned, are they a tool to determine that
3  the water flows properly from one side of the track
4  to the other?
5    A.  That's one part of it.  The other is the
6  hydraulics.  The hydraulic study that's done
7  concurrently is, Okay, this is how the water's
8  going to flow through your bridge structure or your
9  culvert --
10    Q.  Okay --
11    A.  -- totally different science.
12    Q.  Tell us a little bit about that, so
13  that --
14    A.  Absolutely.  Any time you flow, either --
15  there's three types of flow, and the most basic is
16  open-channel flow:  A river.
17    Q.  Right.
18    A.  There it goes.  You just look at the
19  roughness coefficient and the cross-section of the
20  bottom of the channel, and you calculate how much
21  it will carry.
22    Q.  Okay.
23    A.  The next one is the culvert.  Generally,
24  these days we use round pipe.  The railroad has
25  thousands of old stone and concrete box-shaped



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                                   July 14, 2011

37

1   culverts. They never flow full. They will start
2   full at the upstream end. By the time you get to
3   the downstream end, you get a slight hydraulic jump
4   in the pipe if the level drops; and even on the
5   most extreme flows, there may be that much gap. Of
6   course, if it's a slow flow, the gap considerably
7   grows because of the capacity.
8       Q.  I think I understand what you mean. But
9   if I characterize it, please tell me if I'm wrong.
10      A.  Sure.
11      Q.  I think you're telling me that if we take
12  the east and the west for example --
13      A.  All right.
14      Q.  -- at the beginning of the east trestle
15  where the water's going in --
16      A.  Uh-huh.
17      Q.  -- is going to get a little lower at the
18  west end when it comes out; is that what you were
19  saying?
20      A.  Correct. It's similar to open-channel
21  flow. It's not a pressurized pipe.
22      Q.  Right. Now, would you expect the design
23  criteria to be such that the water would never
24  overwhelm that trestle and such that it would not
25  be able to go through that trestle?

38

1       A.  Trestle? Well, we're on culverts still.
2       Q.  Culverts, yeah.
3       A.  Not necessarily.
4       Q.  Okay.
5       A.  There are situations where we are not
6   allowed to discharge more downstream -- to folks
7   downstream --
8       Q.  Uh-huh.
9       A.  -- and hence the reason for people
10  building things like holding ponds in subdivisions.
11  We are not allowed to discharge downstream more
12  than we did prior to our reconstructive efforts, so
13  if that's the case, we would anticipate in holding
14  water back on the upstream side, channelling it
15  through a pipe that would be maybe smaller or
16  capable of carrying less flow than the anticipated
17  maximum so that we do not release it at a relate --
18  release water at a rate downstream that would harm
19  folks downstream or whatever it is we're protecting
20  downstream.
21      Q.  We're still talking about culverts?
22      A.  Yes, sir.
23      Q.  Now, if we move to a bridge or a
24  trestle --
25      A.  Sure.

39

1       Q.  -- like what we're talking about here,
2   explain how that works.
3       A.  The trestle is slightly different. It's
4   considerably more open-channel flow than a culvert
5   would be, and the trestle also contains items that
6   go down into the actual flow, basically, the
7   piling.
8       Q.  Uh-huh.
9       A.  They take the piling -- the shape of the
10  piling that we use today versus the old, the size
11  of the piling, et cetera, into the calculations for
12  the hydraulics for how it's going to flow, in
13  addition, to the fact that on pretty much all of
14  them we have what's called riprap, which is large
15  stones to protect the embankment from washing
16  out -- although we do also use vertical wall-type
17  embankments. But, basically, in the area we're
18  discussing, they're riprap-type embankments, and
19  they're naturally extremely rough and impede the --
20  I don't know if "impede" is the right word. They
21  cause turbulence in the edges of the flow --
22      Q.  Uh-huh.
23      A.  -- just by the shape.
24      Q.  Are any of the restrictions that you
25  mentioned in this area such that UP would be

40

1   worried about moving the water too fast or too
2   great to the other side of the track?
3       A.  No.
4       Q.  Okay. Now, with respect to drainage, and,
5   I guess, I first must ask, what is the right-of-way
6   for the railroad? I mean, somebody's told us 50
7   feet on either side of the track; is that right?
8   Can you give us a good feel for that as a guy who
9   might know?
10      A.  Again, there's no set rule unfortunately.
11  It depends on who owned the railroad before we
12  bought it, or if we owned it and where it is, what
13  state. There's areas -- I can show you areas in
14  Nevada where we owned miles just because the land
15  was government land. When we came through there,
16  they said, Here, take a mile-wide swath and put
17  your railroad here.
18      Q.  Uh-huh.
19      A.  And in some cases, we still own that much.
20  We try to keep a minimum of 50 feet, but, again,
21  for example, downtown Chicago, 50 feet you'd be in
22  somebody's office building. So anytime you make a
23  rash generalization like that, it's 50 feet either
24  way, you're blowing it out of the water. It just
25  doesn't hold.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna

July 14, 2011

41

1    Q.  So does UP consider the adjacent property
2  owners when they look at drainage and, if any
3  reason the track bed is holding water, do they
4  consider the interest and safety of the adjacent
5  property owners?
6    A.  Yes.
7    Q.  Okay.  How do they do that?
8    A.  As far as drainage and adjacent property
9  safety goes, we have two situations we don't want
10  to create.  And this would be under, you know,
11  normal flood conditions, whether it be 25, 50, 100,
12  whatever it is that is of concern.
13    Q.  Uh-huh.
14    A.  We don't want to back water up
15  significantly for a long period of time.
16    Q.  Uh-huh.
17    A.  Some backup is going to happen during an
18  out of the ordinary rain event --
19    Q.  Right.
20    A.  -- everywhere.  That's a fact of life.
21  And then the backwater situation, are we creating a
22  situation where backwater is no longer free to move
23  across the railroad embankment and through our
24  structures, whether they be culverts, or as you
25  said trestles or bridges.

42

1    Q.  Yeah.
2    A.  We don't want to create a natural dam that
3  way and cause the backwater situation to be worse
4  on the other side.
5    Q.  Now, how would the -- let's assume, for
6  purposes of my question, that water's backing up --
7    A.  Okay.
8    Q.  -- against the rail bed --
9    A.  Sure.
10    Q.  How would the UP learn of that?  And just
11  take us through the system of how that might be
12  looked at and decided whether or not it was a
13  problem and how it might be corrected.
14    A.  Uh-huh.  Generally, if water is backing
15  up, it's first observed by our, quote, track
16  inspectors who ride the track frequently, and that
17  frequency depends on the class of track.
18    Q.  Uh-huh.
19    A.  They would first note it.  If, then, their
20  next inspection it was still there or if in their
21  first time through it's extremely high or over the
22  rails, they would report it right away.
23    Q.  Right.
24    A.  So, at that point, if it's over the rails
25  or in danger of getting there, or it's a second

43

1  trip through and it hasn't drained, that inspector
2  is going to report that through his track --
3  there's a federal program we use that reports to
4  the FRA, but also that goes to the manager of track
5  maintenance.
6        That manager of track maintenance will
7  look at that and in the course of his normal duties
8  say, Okay, he found two vertical split heads, two
9  areas with insufficient ties in 39 feet and water
10  not -- water backing up at this mile post.
11    Q.  Uh-huh.
12    A.  Well, he's going to look at the vertical
13  split head, and he's going to look at the
14  insufficient ties in 39 feet, and he's going to
15  shoot me a note or call me as manager of bridge
16  maintenance, even though that's not my title
17  anymore, but at some time --
18    Q.  At that time --
19    A.  At that time, I would get a phone call or
20  an e-mail saying, Hey, our track rider reported at
21  this mile post the water's backing up and not
22  flowing through.  The only exception to that, and I
23  need to add to that, culverts under 36 inches --
24    Q.  Uh-huh.
25    A.  -- are handled by the track department.

44

1    Q.  I ran into that.
2    A.  Did you run into that?  Yeah.  48 and
3  above are ours in the bridge department; 36 -- and
4  that's the standard size.  Actually, the way it
5  reads is under 48, but the next standard size down
6  is 36, so in that case, he would have to go out
7  there in his waders and see what's plugged it up.
8    Q.  Now, I want to take you back to 1.2 for a
9  minute --
10    A.  Sure.
11    Q.  -- as to requirements No. 2?
12    A.  Okay.
13    Q.  It says "During heavy rainfall or runoff,
14  monitor water-carrying devices -- " that's bridges
15  or trestles we're talking about --
16    A.  Uh-huh.
17    Q.  -- in this case --
18    A.  Uh-huh.
19    Q.  -- "...to make sure they handle the flow
20  of water -- "
21    A.  Yes.
22    Q.  "Enlarge any devices that cannot handle
23  the water flow.  Report such devices to the Manager
24  Track Maintenance."  That's what you've just
25  described?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                        July 14, 2011

45

1      A.   That's exactly what I just said, yeah.
2      Q.   Yeah.  So you wouldn't inspect it?  Your
3   inspectors would do that?
4      A.   Yes.
5      Q.   If they monitor the water and see it
6   backing up, you would expect them to notify you of
7   the condition you just described for us?
8      A.   Yes, yes.  I would expect notification of
9   that.
10     Q.   Because that's their job?
11     A.   Yeah, they do that.
12     Q.   And they're required under federal law to
13  do that as well, aren't they?  That's part --
14     A.   Yes.  This UP field manual is basically
15  our take on how we're going to interpret the
16  federal law.  In almost every case, what we write
17  is more stringent than the federal law.
18     Q.   Well, assuming for a minute that you get
19  the report that water's backing up and --
20     A.   Uh-huh.
21     Q.   -- is endangering a subdivision.  How do
22  you act as bridge maintenance manager?  What do you
23  do to be sure what's going on, and whether or not
24  an evaluation is necessary --
25     A.   Uh-huh.

46

1      Q.   -- and, if necessary, how is it going to
2   be dealt with?
3      A.   Well, as bridge maintenance manager, my
4   first thing would be to put my eyes on it.
5      Q.   Okay.
6      A.   All right?  Is there a problem here?
7      Q.   All right.
8      A.   If the problem is something I can fix with
9   in-house forces, I'll get them en route.  Do I need
10  a contractor?  I have emergency contractors on
11  supply -- on standby if I need them with larger
12  equipment.  Is it something that, Okay, this
13  culvert has been reported collapsed for ten years?
14  Is this finally time to do something about it
15  because now we have a standing water issue that's
16  not going down?  So I'll look into both the history
17  and the current situation and make a field decision
18  from there.
19     Q.   Okay.  Have you ever been in a situation
20  where you made a decision that backing up the water
21  -- the water backing up needed additional bridges,
22  culverts or trestles in an area?
23     A.   Yes.
24     Q.   Okay.  And you made that through the
25  hydrology studies?

47

1      A.   The one -- the one that comes immediately
2   to mind occurred, I believe, it was around October
3   of '09 in Lewisville, Arkansas.  That was one of
4   those where we had an old, brick box culvert that
5   the inspectors had been reporting for several years
6   had collapsed --
7      Q.   Uh-huh.
8      A.   The highway department called me and said,
9   Our highway is under eight feet of water; can you
10  take care of this?  And I went down there, took a
11  look at it and said, Yes, I can take care of this;
12  and we bored in another 48-inch pipe right next to
13  the old one and relieved the pressure and the
14  problem is solved.  Didn't even have to call for a
15  hydraulic study because I was replacing -- I was
16  replacing a 24 pipe with a 48 --
17     Q.   Okay.
18     A.   -- so it was one of those no-brainers.
19  Okay, I know how to fix this.  I've got the
20  technology; I've got the capability; let's fix it.
21     Q.   With your familiarity of the area because
22  you worked here, I want to just try to orient us to
23  ask some specific questions --
24     A.   Sure.
25     Q.   -- and the first one I'm going to show is

48

1   a Google map, which everybody uses these days for
2   one reason or another --
3      A.   Uh-huh.
4      Q.   -- but I'm going to represent to you
5   that's the Windwood subdivision and --
6      A.   Sure.
7      Q.   -- looking at the map, are you familiar
8   enough with that area, to say that kind of lays out
9   the way you remember it?
10     A.   Well, I'm assuming this diagonal line is
11  us.
12     Q.   I think it is.
13     A.   Yeah, that's us.  I believe this is that
14  area of houses.
15     Q.   It is.  That's the Windwood subdivision.
16     A.   Right.  And then this access road -- I
17  don't remember this Pinewood Cove and April Lane
18  business being here.
19     Q.   I can't find it out there.
20     A.   No.  There's an access cove -- road with a
21  gate, and I believe it's at the end of this
22  Windwood --
23     Q.   Do you want to circle that for us because
24  we'll be talking about --
25     A.   All right.  Yeah.  There's --



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

49

1    Q. -- that access road.
2    A. That access road is owned I believe --
3    Q. That marker --
4    A. They got me a pen that doesn't write. Now
5  we're really going to mark it really good.
6    Q. That's -- now just so we have a -- we'll
7  be throwing it up on the screen.
8    A. You've brought a gun to a knife fight
9  here.
10   Q. Yeah.
11   A. Okay. We have circled that. That, I
12 believe, is where the access road -- I don't know
13 who owns the land, but the key on there I had to
14 get from the City of Beebe Water and Sewer
15 Department --
16   Q. Okay. Yes, you did --
17   A. -- to get in there; and we can actually
18 drive to one of our bridges by that access road.
19   Q. Right.
20   A. So, and, like I said, I don't know who
21 owns that property --
22   Q. Okay.
23   A. -- and I know some of those roads I don't
24 think exist.
25   Q. Right.

50

1    A. I think that's a Google fantasy.
2    Q. Okay. But for purposes of laying out the
3  relative condition --
4    A. Uh-huh, uh-huh.
5    Q. -- and the -- and the position of the
6  railroad with respect to the subdivision, do you
7  think that adequately shows where the railroad is
8  and where the subdivision -- absent April Lane and
9  Pinewood Cove.
10   A. With those stipulations, I would say
11 that's an accurate representation, yes.
12        MR. SWINDOLL: Let's mark that as 2,
13 please.
14        (Exhibit No. 2 was marked for
15 identification.)
16 BY MR. SWINDOLL:
17   Q. I'm going to show you now what I have
18 learned to be a profile.
19   A. Okay.
20   Q. And it's a -- and this is my first
21 experience with them --
22   A. Oh, there's a lot of stuff on there.
23   Q. -- and trying to put it together. So I
24 want to talk with you about it, but I want you to
25 look at it and see if you can help orient us to it.

51

1    A. All right. There's a lot stuff on these.
2    Q. Yeah, and some things we -- are important
3  for our discussion and others are not.
4    A. Yeah. You don't care the age of the rail,
5  do you?
6    Q. Well, I might --
7    A. Okay.
8    Q. -- but what I'm more interested is which
9  direction is St. Louis?
10   A. Well, let's see. Little Rock is on this
11 end, and St. Louis is on this end.
12   Q. Okay. So at the 310 mark, St. Louis --
13   A. That's the St. Louis --
14   Q. That's the St. Louis direction?
15   A. Yes, it is.
16   Q. Write that on there for us.
17   A. How's that?
18   Q. Okay. Great. And then the other end
19 is --
20   A. Towards Little Rock.
21   Q. -- towards Little Rock where we all go.
22   A. I'll write that on there as well.
23   Q. Now, in your position, have you looked at
24 that enough to tell us that that's one that we can
25 use to discuss the rail bed in this area?

52

1    A. Yes.
2    Q. Okay. It's marked UP-004 and 005, and in
3  trying -- I tried to put them together just so we
4  could talk about it.
5    A. Uh-huh, uh-huh.
6    Q. Do you think it fairly and adequately
7  represents the profile map that you're familiar
8  with?
9    A. Yeah, this would be a good representation
10 of that.
11   Q. Okay. Now, there's -- you mentioned
12 there's a lot of stuff on it.
13   A. Ohh-ho.
14   Q. Does it have -- for example, do it have
15 the bridges or trestles in this area?
16   A. It does.
17   Q. I'm wondering if you could mark in red,
18 there, the bridges or trestles that exist now. I
19 think they're marked as waterways, but I am not
20 sure.
21   A. Okay. Do you want me to just circle the
22 little guys?
23   Q. Yeah.
24   A. It actually has the information of what
25 kind they are and everything else. I don't know if



Toll Free: 800.852.9737
Facsimile: 214.954.4111

ESQUIRE
an Alexander Gallo Company

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                           July 14, 2011

53

1    you've looked at that.
2        Q.  I tried to.
3        A.  That would be one.  PCB is one.  That's a
4    high/wide detector, concrete box culvert, that's a
5    signal tower, concrete box culvert, crossover,
6    timber stringers, 79 foot -- you don't want
7    culverts, right?
8        Q.  Right.
9        A.  Okay.  Box culverts, 6 by 6; 4 by 4; stone
10   blocks culvert at Beebe, end of the 28-foot track
11   centers, hot box detector.  The beginning of 28,
12   there's a reinforced concrete bridge and a 7-span
13   reinforced concrete bridge and -- okay.  That's a
14   signal appliance.
15       Q.  Okay.
16       A.  So there --
17       Q.  If you'll just turn that up and show the
18   camera just for a second that you've marked the
19   bridges, and we have St. Louis -- we actually --
20       A.  Here we go.
21       Q.  Okay.  Great.
22       A.  All right.  We have done our homework.
23       Q.  Okay.  Now, the elevation of the track is
24   also listed, but I'm not sure what the elevation
25   represents.  Would you explain that to us?

54

1        A.  Those -- they do show occasional
2    top-of-rail elevations is what it represents.
3        Q.  Okay.
4        A.  And those are for determining the grades
5    between different sections.  That's why they show
6    them on these.
7        Q.  Okay.  Could you show us by -- I think I
8    might have marked as many of 12 of them --
9        A.  Okay.
10       Q.  -- and what I'd like you to do in this
11   black pen here is circle the 12 elevations that are
12   listed on this map.
13       A.  Well, let's see if we can find those
14   fellers.  There we go.
15       Q.  Okay.
16       A.  There's elevation 238, 252; there's 225,
17   222, there is 218, 218, 227, 228, 244, 240, 219,
18   227.  How many did you say you found?
19       Q.  I counted 12.
20       A.  1, 2, 3, 4, 5, 6, 7, 8, 9, 10 -- I've got
21   12 as well.
22       Q.  Okay.  Now, just tell us so that we all
23   understand what those represent on the profile map.
24   You said top of track --
25       A.  Top-of-rail.

55

1        Q.  -- but I want to be sure I'm talking to
2    you in the language you need to be.
3        A.  That is top of the steel rail that the
4    wheels sit on.
5        Q.  Okay.  And that is the elevation above sea
6    level?
7        A.  Yes.
8        Q.  Okay.  So would you look at for me and
9    tell me the lowest point on the track in the
10   ten-mile stretch that we're talking about?
11       A.  Sure.  It looks like I've got a pair of
12   218s here.
13       Q.  All right.  And --
14       A.  And --
15       Q.  -- they are at what mile marker?
16       A.  The grade between them is zero, so there's
17   a segment here of 218; and they are approximately,
18   yeah, 314.5 roughly --
19       Q.  Okay.
20       A.  -- to 315.2 maybe.
21       Q.  All right.  Now, there is a trestle at
22   314 -- I call it 314.9 throughout the litigation,
23   but it might be a little bit different.
24       A.  Yeah.
25       Q.  Is there one there?

56

1        A.  Yeah.  It's shown here as 314.88, but
2    you're essentially in the same place, yeah.
3        Q.  Okay.  Would you mark with an X that
4    trestle please.
5        A.  Certainly.  Black?
6        Q.  Yes.  Now, am I clear that that represents
7    the lowest point on the track bed for 10 miles?
8        A.  Yes.
9        Q.  Okay.  So if we were looking at that and
10   we were standing on the east side of the track as
11   we looked at it, the track bed would come from the
12   right to a lower position and from the left to a
13   lower position?
14       A.  Yes.
15       Q.  Okay.  And the trestles in this lower area
16   are designed to carry the water correctly from one
17   side to the other in the manner that you and I have
18   been talking about for about an hour; is that
19   right?
20       A.  So far as I know.  I've not designed them
21   personally, and I have not seen the original design
22   notes for them; but so far as I know, they met the
23   current standard of the railroad that built them at
24   that time, yes.
25       Q.  And the purpose for UP and the trestles in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

57

1  this area would be to move the water efficiently
2  from one side to the other as we've discussed in
3  the last hour or so; is that fair?
4      A.  That's one of them.  The main one, of
5  course, is to keep the train --
6      Q.  Get the train over --
7      A.  -- over the impediment.
8      Q.  And you said that --
9      A.  But purpose number two, which is the whole
10  reason it's a trestle and not a solid fill is to
11  convey water from one side to the other, yes.
12      Q.  And UP would be in the position -- take
13  the position that the trestles there should be able
14  to pass the water through there and not back the
15  water up as you and I have talked about?
16          MR. MCKAY:  Object to form, but go
17  ahead.  Go ahead.
18          THE WITNESS:  Back it up.  It's
19  always going to back up slightly --
20  BY MR. SWINDOLL:
21      Q.  Right.
22      A.  -- especially during significant rain
23  events.  It's to convey it out of there in a
24  reasonable amount of time after a significant rain
25  event.

58

1      Q.  And it should deal with the expected water
2  fall -- rainfall of the water --
3      A.  Yes.
4      Q.  Expected.
5      A.  Expected waterfall, yes.
6      Q.  Have you described for us what level the
7  expected rain fall is in this area that UP
8  considers expected?
9      A.  I don't believe we've even talked about
10  that, no.
11      Q.  I don't think we have either.  Let's stop
12  because I think we're going to change tapes now.
13      A.  Oh, okay.
14          THE VIDEOGRAPHER:  This is end of
15  Videotape No. 1.  The time is 9:59 a.m.  Counsel,
16  we're off the record.
17          (Whereupon a brief recess was taken.)
18          (Exhibit No. 1 was marked for
19  identification.)
20          THE VIDEOGRAPHER:  This is beginning
21  of Videotape No. 2.  The time is 10:04 a.m.
22  Counsel, we are back on the record.
23  BY MR. SWINDOLL:
24      Q.  Thank you.  Mr. McKenna, we were talking
25  about an exhibit in front of you.  And at this

59

1  point, I'd like to mark that as Exhibit 3 to your
2  deposition today, and the court reporter will do
3  that for us.
4      A.  Very good.
5          (Exhibit No. 3 was marked for
6  identification.)
7  BY MR. SWINDOLL:
8      Q.  We talked about -- we talked about
9  existing trestles out there for a minute and
10  bridges, and I talked about 314.9 only because,
11  one, I've been out and seen --
12      A.  All right.
13      Q.  -- and during the discovery phase of this
14  case, UP has been kind enough to provide some
15  documentation to us.  And I'm looking at UP number
16  007 for a minute and ask if you can identify that
17  for us just for purposes of discussion -- what it
18  is and what it represents to UP.
19      A.  This is a document that's kept in archive
20  of a profile of a bridge here; and it's actually
21  two different bridges, and it looks like these are
22  the 1930 drawings of the condition of the bridge as
23  it was surveyed in the 19 -- in April of 1950.
24      Q.  Okay.  And that shows 4/25/50 on the
25  diagram, you're picking up the information?

60

1      A.  Yeah.  That's -- that's on the diagram
2  here.  These two drawings of these two bridges both
3  indicate 4/25 of 1950 --
4      Q.  Okay.
5      A.  -- is when this was produced.
6      Q.  Now, are they the east and west bridges?
7  I mean, for each -- this is a double-track system?
8      A.  This area is double-track.
9      Q.  And I say that because I've guessed that
10  65'10" on one side and 65'10" on the other --
11      A.  Uh-huh.
12      Q.  -- so I have labeled it 412 east and 412
13  west.  Is that something that you know that
14  terminology?
15      A.  Well, I see that terminology here.  It's
16  not the current terminology, but yes, that's what's
17  indicated here that was used in the '50s to
18  identify these, yes.
19      Q.  Okay.  Now, there are some numbers that
20  are on it, and what I'd like to do for a second is,
21  I think you have addressed some of these.
22      A.  Sure.
23      Q.  First, there's -- looks to be a length of
24  65 feet 10 inches on this?
25      A.  That's --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                    July 14, 2011

**61**

1    Q.  What does that represent?
2    A.  65 foot 10 would indicate the end -- it's
3    generally back of the headwall to back of the
4    headwall --
5    Q.  Uh-huh.
6    A.  -- on the bridge.
7    Q.  Okay.  And so what this diagram shows us
8    is that this -- this trestle bridge is 65 feet
9    10 inches wide if you measure it from the end of
10   the box to the end of the box; is that what you
11   meant?
12   A.  That would be the length, but yeah, that's
13   basically what I meant, yeah.
14   Q.  Okay.  All right.  Now, does this also
15   show us -- and you mentioned -- it says "ground,"
16   and "point of pile," but what does the "ground"
17   mean?
18   A.  Where are you looking at?
19   Q.  Right below the diagram --
20   A.  Uh-huh.
21   Q.  -- there's a series --
22   A.  Oh, oh, oh, oh, oh.
23   Q.  -- of numbers.
24   A.  That I got.  Okay.
25   Q.  Explain to the -- turn around and using

**62**

1    this, if you will, just show us what those numbers
2    represent.
3    A.  There you go.  Okay.  You got some
4    highlighted here.
5    Q.  Yeah.
6    A.  Okay.  Ground:  That number is --
7    typically, if it's the same as we do it today,
8    which I'm presuming it is, I can't be a hundred
9    percent sure.  That would be bottom of rail to
10   ground level.
11   Q.  Okay.
12   A.  That would be those numbers and then our
13   current method of keeping track of bridges --
14   Q.  Uh-huh.
15   A.  -- we do show that for each time we have
16   what's called a "bent."  A bent is any time the
17   bridge touches ground.
18   Q.  Okay.
19   A.  Okay?  So that would simply be bottom of
20   rail in this case starting at 4 foot, 8 foot, 10
21   foot, indicating bottom of rail to ground line.
22   Q.  Okay.  So that -- it really measures the
23   opening from the ground to the top of the rail --
24   A.  Bottom of rail --
25   Q.  -- onto that stringer?

**63**

1    A.  Bottom of rail.  I'm not sure where that
2    convention came from, but it's been used for years.
3    Q.  Bottom of the rail?
4    A.  Bottom of rail --
5    Q.  Bottom of the rail --
6    A.  -- that's where they measure it from.
7    Q.  -- to the top of the ground?
8    A.  Yeah, yeah.
9    Q.  Now, in figuring the area, we would have
10   to figure what?  I don't know how to do this
11   calculation.
12   A.  Uh-huh.
13   Q.  As an engineer, could you just basically
14   tell us how you might calculate the amount -- this
15   tells us what kind of drainage is going to be in
16   there, and it's a huge complicated formula I'm not
17   asking you to explain.
18   A.  Sure.
19   Q.  Just explain generally what that means to
20   us in ordinary terms.
21   A.  Generally, what's done there, and there --
22   like you say, there's several ways to calculate it.
23   It's now all computerized, of course, but the old
24   manual way that I learned when I was a college
25   student and can still actually perform if actually

**64**

1    called to, is you simply take the individual areas
2    and sum them up --
3    Q.  Right.
4    A.  -- and you would take, for example, on
5    this first one, which is the 412 east, I would take
6    and I would start on the left side and take the
7    area here and I would know the height and the depth
8    of the structure.  You have to take the structure
9    depth out because it impedes flow --
10   Q.  Uh-huh.
11   A.  -- which is the depth of stringers, the
12   thickness of the deck and then the height of the
13   guard rail.
14   Q.  Right.
15   A.  Okay.  So you take all that out and that
16   gives you your average height.  You would average
17   the height between the two and simply figure that
18   area.
19   Q.  Okay.
20   A.  Then you would go to next one and do the
21   same thing.  Average eight and ten, you get nine
22   foot, take out the structure depth --
23   Q.  Down the line?
24   A.  -- down the line; and you add up, you get
25   a total opening area.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                                    July 14, 2011

65

1    Q.  And that opening relates to the capacity
2  of the trestle to pass water in what way, Phil?
3    A.  The opening -- it's a direct linear
4  relation, basically.
5    Q.  Okay.
6    A.  The larger the opening, the more the water
7  flow.
8    Q.  Okay.  Now, I'm going to show you some UP
9  006, which I think is a trestle that we'll talk --
10  by the time you get to the stand, we'll have talked
11  about this having been removed.  I want you to look
12  at it for minute with me and see if that's the same
13  kind of terminology and -- as used in the one that
14  we just marked as Exhibit No. 4?
15    A.  Yeah, this is a similar archive document.
16  Again, we keep these for our own records, and it
17  was obviously produced on 4/25 of 1950 by the date
18  on there, and it's in the same region of the hoxie
19  sub.
20        THE COURT REPORTER:  How do you spell
21  that?
22        THE WITNESS:  H-o-x-i-e, hoxie.
23  BY MR. SWINDOLL:
24    Q.  Now, does it also show us the capacity
25  that that trestle would have passed water for at

66

1  the time it was built?
2    A.  I don't know if the flow capacity is
3  listed --
4    Q.  I used the words "flow capacity."  I meant
5  that area that we've been describing that you could
6  calculate and that I could not.  In geometry, I
7  could not do that.
8    A.  Does it give me the information that I
9  could calculate the hydraulic opening; is that what
10  you're asking?
11    Q.  Right.  Yes.
12    A.  Yes, it does.
13    Q.  And does it show that that bridge was 116
14  feet 4 inches long at the time?
15    A.  Yes.
16    Q.  Does it show that the opening at the
17  bottom had at the beginning on the left side as
18  little as 4 feet progressing "9',8',8',8'...7',
19  4'."  That's the distance that you and I were
20  talking about earlier?
21    A.  That's correct.
22    Q.  Okay.  And it was built in 1950 is what
23  I'm --
24    A.  No, no, no, no --
25    Q.  This is drawn in 1950?

67

1    A.  Yeah.  This built -- this was built -- it
2  was -- says the original "year built" is blank.
3    Q.  Yeah.
4    A.  If you see that.
5    Q.  I do see that.
6    A.  Right.  Then "redriven" in 1930, and what
7  you'll find is, if you go out there, in 1930 we
8  changed this bridge out.
9    Q.  Uh-huh.
10    A.  The existing structure that's there is the
11  1930 structure.  If you go down and start digging,
12  you're going to find evidence of old piles below
13  ground line where we -- they were cut off where we
14  had a previous bridge.
15    Q.  Uh-huh.
16    A.  And the plans for that -- do they exist?
17  I have no idea.  Have they -- I've never seen them
18  if they do.
19    Q.  Can you take this nonexisting trestle and
20  mark for us on Exhibit 3 where it would
21  approximately have been?
22    A.  Let's see if we can -- this is 3, right?
23        MR. SWINDOLL:  Yes.
24        THE WITNESS:  You need to 4 these up?
25  Okay.  Let's take a second here and let our court

68

1  reporter mark this for us.  Okay.  Do you need to
2  do both of them or just one?
3        MR. SWINDOLL:  No, just one.
4        THE WITNESS:  All right.  Just one,
5  okay.
6        (Exhibit No. 4 was marked for
7  identification.)
8  BY MR. SWINDOLL:
9    Q.  Okay.  Looking at mile post 314, pole 32.
10  I have no idea what that means.
11    A.  Well, believe it or not, 314 -- now, the
12  mile posts unfortunately change over time --
13    Q.  Yes.
14    A.  -- due to reroutes, resegmenting and more
15  accurate measuring.  The pole actually refers to
16  the old telegraph poles --
17    Q.  Right.
18    A.  -- that were alongside the railroad
19  that -- in this area, they're gone.
20    Q.  Yeah.
21    A.  Yeah.  There are still areas where we have
22  the poles, and you can find a bridge that way.
23  This is not one of them, so let's see if we can
24  find approximately where this would be.  If the
25  mile posts line up, which they're -- is there any



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

69

1  indication exactly where this would be?  See, all
2  it's showing is 314, 32 -- just going to put it at
3  almost at 315.  I can't actually get a --
4      Q.  Can you come within a hundred feet of it,
5  just approximately?
6      A.  If you give me 500 feet, I'll get it, but
7  because mile posts change --
8      Q.  Okay.  How about 500 feet --
9      A.  Yeah.
10     Q.  Let's take your estimate of 500 feet.
11     A.  Let's just estimate from where that is.
12  There's 314.
13     Q.  What I'd like you to do is use this magic
14  marker and just draw a string -- a line across the
15  track where it approximately is within the confines
16  of your estimate.
17     A.  Okay.  Again, this is plus or minus 500
18  feet because of the mile poles (sic) --
19     Q.  I got you.
20     A.  -- change, but we'll estimate it's right
21  about there, and the width of this pen is going to
22  make it 500 foot long --
23     Q.  Okay.
24     A.  -- so it's somewhere in that region.
25     Q.  Okay.  Right.

70

1      A.  I, you know, if I had to stake my
2  reputation and say it was there, I'm not going to
3  do it.
4      Q.  No, but I'm asking you to estimate --
5      A.  That's an estimate.
6      Q.  -- within 500 feet.  We know one of them
7  is gone -- we know two of them are gone, right?
8      A.  Right.
9      Q.  And so we're just estimating as best you
10  can where one of them was?
11     A.  Where it may have been.  Yes, that's
12  correct; somewhere in there.
13     Q.  Now, I'd like you to look at bridge 413
14  for a second.
15     A.  Let's see what you got here.
16     Q.  I think this is the other one.  It's
17  marked as Union Pacific number -- Joe, do you know
18  what number this was?
19         MR. MCKAY:  The date's not on it?
20         MR. SWINDOLL:  Yeah, it doesn't
21  really show on my diagram.  Oh, yeah, it does, 008.
22         MR. MCKAY:  What's the bridge --
23         MR. SWINDOLL:  We looked at --
24         MR. MCKAY:  -- number?
25         MR. SWINDOLL:  UP 008 and it's 413.

71

1         MR. MCKAY:  Okay.
2         MR. SWINDOLL:  East and -- yeah.
3  BY MR. SWINDOLL:
4      Q.  Now, I'll tell you, Phil, from what we
5  know, we don't have both sides of the bridge.  All
6  we have is one.
7      A.  Okay.  So we're missing -- which one is
8  this?  A, east and west, it said.  What they may
9  have -- well, I don't want to guess.  Never mind.
10  Yeah, I don't know what they've done, but for some
11  reason there's only one shown.
12         THE COURT REPORTER:  Only one shown?
13         THE WITNESS:  Only one shown.  I'm
14  sorry.
15  BY MR. SWINDOLL:
16     Q.  Assuming that this is UP 008, and it
17  represents the other nonexisting bridge, I'm going
18  to ask you to do the same thing on this one that we
19  did on the other one; that is, we want to mark it
20  as 5 and then you give me your approximate
21  location.
22     A.  Okay.  Do you want to mark it as 5, and
23  I'll start thinking about where that might be.
24         (Exhibit No. 5 was marked for
25  identification.)

72

1         THE WITNESS:  Again, as an engineer,
2  I hate guessing, so as long as we qualify this as
3  an educated guess, I'm okay marking it.
4  BY MR. SWINDOLL:
5      Q.  Yeah, it's an educated guess.  That's --
6  and it's going to be a better educated guess than
7  the plaintiff's lawyer would have trying to guess
8  it.
9      A.  Pole 8 -- again, if the mile posts haven't
10  changed, it's in that region.
11     Q.  Okay.  Good.
12     A.  Now, we haven't marked which is which.  Do
13  we need to or you want to just leave -- assume --
14     Q.  Well, why don't you put A and B.
15     A.  There you go.  This pen, right?
16     Q.  And we'll -- yes.
17     A.  Okay.  So this one we'll put A.
18     Q.  And just mark A on that one, and that way
19  there'll be no question what you're doing.  Yeah.
20     A.  A -- that way, yeah because these are
21  labeled funny.
22     Q.  Yeah.
23     A.  And this one is B, and there's your B.
24     Q.  Okay.
25     A.  Okay.



Toll Free: 800.852.9737
Facsimile: 214.954.4111

ESQUIRE
an Alexander Gallo Company

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                                    July 14, 2011

73

1          MR. SWINDOLL: Now, we'll mark and
2    attach 5? Okay.
3    BY MR. SWINDOLL,
4          Q.  Now, I'm just about through with all these
5    diagrams and bridges and all that stuff.
6          A.  All right.  What else do you need?  You've
7    got my handiwork here.
8          Q.  Are you familiar enough with the history
9    to know that there are -- in fact, the two bridges
10   that you had marked no longer exist in this area?
11         A.  There are no bridges there, and from what
12   I've seen of these, quote, archive documents --
13         Q.  Uh-huh.
14         A.  -- they did at one point exist, and I have
15   also been told that they were there.
16         Q.  Okay.  Do you -- are you -- have you been
17   told why they don't exist anymore?
18         A.  The -- yes, and I don't know what detail
19   you want on that.  I was told in a conference that
20   I had with the mayor of Beebe --
21         Q.  Uh-huh.
22         A.  -- that both bridges were burned when
23   fires -- agricultural fires by the adjacent
24   landowner at the time was burning off his field and
25   it got out of control.

74

1          Q.  That's what you understand?
2          A.  That's what I was told.  You know, I don't
3    know about the legality of admissiblities --
4          Q.  Right.
5          A.  -- of fourth parties and all this, but
6    that's what I was told.
7          Q.  Okay.  Now, looking at Exhibit 3 for a
8    minute.  The two bridges that no longer exist are
9    at the lowest area -- in the lowest area, that 318
10   that we discussed and you described and circled for
11   us; is that correct?
12         A.  Actually, the way I marked it, they're
13   right at the beginning of that low point, yes.
14         Q.  Is there another bridge in the area, then?
15         A.  There's two of them shown.
16         Q.  There's two of them shown?
17         A.  Yes, that's correct.
18         Q.  So at one point there were four bridges in
19   this area?
20         A.  In the approximate -- yeah, as
21   approximately as these are located, there could be
22   as many as four in that low spot.
23         Q.  Do you know where Windwood subdivision and
24   the subdivision that we're talking about in
25   relationship to the profile map?  Could you give us

75

1    a red circle or an arrow in the direction that you
2    think it is?
3          A.  I can -- you know, I can't get it
4    exactly --
5          Q.  I'm going to tell you that 314.9, the
6    sewer station we've been talking about --
7          A.  Right.  And there's a 314.88, I believe --
8          Q.  Yeah.
9          A.  -- that still exists on here, right there.
10         Q.  Uh-huh.
11         A.  So let's see.  St. Louis is that way.  The
12   subdivision should be somewhere maybe -- what color
13   are we going?  Black again?
14         Q.  Red.  Just mark an X in the direction that
15   you know the subdivision is.
16         A.  Okay.  So from 314.88, I would put it
17   somewhere in that general direction, would be where
18   that -- that Windwood, I think the name of it is,
19   subdivision.
20         Q.  Do you have any reason to believe that
21   those trestles were not passing water or used for
22   drainage to pass water from one side or another
23   when they were closed?
24         A.  Closed?
25         Q.  When they were --

76

1          A.  Closed.  When were they closed?
2          Q.  Well, they were closed in the late '70s,
3    early '80s.
4          A.  Oh, oh.  Okay.  You're using "closed" as
5    opposed to "removed" again.
6          Q.  I'm sorry.
7          A.  There you go.
8          Q.  Your term and that's something important
9    to you.
10         A.  Yeah.
11         Q.  I meant removed.
12         A.  Yeah.  Closing of a structure has a very
13   definite definition in the railroads.  When they
14   were removed, I don't know that the subdivision was
15   there.
16         Q.  They weren't.
17         A.  Oh, okay.
18         Q.  Yeah.
19         A.  Okay.  But in any case, they do -- they
20   would contribute to water flow under the railroad
21   in that generic, general area.
22         Q.  Now, going back and looking -- just a
23   couple more questions.  On Exhibit No. 4 there was
24   a 116-foot bridge; is that correct?
25         A.  Exhibit No. 4 -- let's see.  This is the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

77

1  one with the two that we just looked at --
2      Q.  Yeah, that's B?
3      A.  -- they're 116 foot 4 twins, yes.
4      Q.  Okay.
5      A.  Yes.
6      Q.  And 5 was 115 feet?
7      A.  And 5 was 115 foot 10, that's correct.
8  And that -- this is the one we marked A on No. 3
9  here.
10     Q.  Now, there's something that's really
11 interesting with respect to the diagram, Exhibit 5.
12 As you look at the depth of the railroad and that
13 opening that we were trying to calculate and
14 describe --
15     A.  Uh-huh.
16     Q.  -- it appears to me that on one side, the
17 depth of the opening is more than on the other; is
18 that fair?  Is that what that means?
19     A.  That's a valid statement.  It looks like
20 there is some sort of either an abandoned channel
21 or it could even be, not knowing what was going on
22 when they built this bridge, that could be a
23 passage from one field to another since it was an
24 agricultural area, so it may not have been to
25 convey -- that -- that additional depth may not --

78

1  nothing to do with the water.  11 to 12 feet sounds
2  like he may have been moving farm equipment across
3  the railroad right away there.
4      Q.  Okay.
5      A.  So that's another possibility.
6      Q.  But there's at least two possibilities --
7      A.  There's at least two --
8      Q.  -- that you're telling us?
9      A.  -- and there may be some we haven't
10 thought of.
11     Q.  Right.
12     A.  Yeah.
13     Q.  One could be that there's an active water
14 course --
15     A.  Right.
16     Q.  -- when they built it?
17     A.  Yeah.
18     Q.  And the other is that it was built so that
19 people could get from one side of the track to the
20 other to keep from being isolated?
21     A.  Yes.
22     Q.  Okay.
23     A.  We agree.
24     Q.  In your capacity as bridge maintenance
25 supervisor in this area, did you ever discuss this

79

1  area with your inspectors?
2      A.  Sure.
3      Q.  Did you ever discuss with them any water
4  in the field adjacent to this area?
5      A.  Ever?  Yes.
6      Q.  Tell me about that.  I'm sure you did know
7  that, that's where we're going, isn't it?
8      A.  Well, I know -- I suspect that I know
9  where you're headed is, did we have a conversation
10 about flooding in that area?
11     Q.  Yes.
12     A.  And the answer is several times.
13     Q.  Okay.
14     A.  Particularly after, I guess, it was
15 Christmas morning:  I can't imagine less than five
16 calls back and forth between the inspectors and
17 others out there concerning the situation where the
18 drainage had gone around the bridge and washed out
19 part of the trackway.
20     Q.  Now, I think we all know now by the time
21 you testify that that's in December of '09.
22     A.  That's correct.
23     Q.  Did you have any description or discussion
24 with them before October of '09 about any water
25 standing in the fields or backing up against the

80

1  track at any time during your reign?
2      A.  Not that I recall.
3      Q.  Okay.  If they had brought that to your
4  attention, would you have considered and looked at
5  that to determine whether or not any action was
6  necessary on behalf of the UP?
7      A.  Yes.
8      Q.  Why would you have done that?
9      A.  Safety of the public, safety of the
10 railroad.  Amtrak goes across there.  There's
11 just -- primarily, the answer would be, yes,
12 because of safety.
13     Q.  Why is safety an issue in this?  What do
14 you mean?  How are people endangered?
15     A.  The primary danger of a track washout due
16 to an extreme rain event is a derailment of a train
17 containing hazmat.  That will affect an area
18 tremendously large with evacuations up to five, ten
19 miles in all directions.
20     Q.  Okay.
21     A.  That's the primary one.  Of course, that's
22 a very costly cleanup.  Environmental laws now
23 govern far more than they did even five, ten years
24 ago.
25     Q.  Right.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                           July 14, 2011

81

1      A. So that if we put a hazmat train, and
2  there's a lot of them that run that line on the
3  ground, and we start leaking, that's our primary
4  concern. Of course, we're also concerned for the
5  safety of the two guys in the locomotive -- the
6  engineer and the conductor. If they come across a
7  spot that's washed out and derailed, they usually
8  don't fare too well.
9      Q. I got you.
10     A. Other issues in this particular area,
11  there is some development that's occurred adjacent
12  to the railroad, the Windwood subdivision that
13  you're talking about here.
14     Q. Uh-huh.
15     A. That has occurred in recent years.
16  Flooding in that area could affect those people and
17  has, obviously, or we would not be sitting here
18  today.
19     Q. Yes, sir.
20     A. Flooding downstream, again, if we have a
21  backwater situation.
22     Q. Okay.
23     A. Due to change in additional levee
24  construction or whatever during an extraordinary
25  rain event, backwater can be held up by the

82

1  railroad and cause flooding further upstream or
2  downstream on whatever we're backing up that
3  wouldn't all necessarily be there either, so yes.
4  That's a long answer to a short question as to what
5  I mean by safety --
6      Q. Yes.
7      A. -- but it -- I think it covers it.
8      Q. So one of the safety concerns would be
9  people adjacent to the track; in this case, the
10  subdivision?
11     A. Sure.
12     Q. And that's because a railroad must use
13  good engineering practice to avoid unnecessarily
14  endangering these people in the subdivision, would
15  you agree?
16         MR. MCKAY: Object to form.
17  Speculation, but go ahead.
18         THE WITNESS: Say the question again.
19  Joe threw me off track. Sorry.
20         MR. SWINDOLL: Yeah. I'm sorry.
21         THE WITNESS: Yeah. Go ahead. Just
22  re-ask it, if you would.
23  BY MR. SWINDOLL:
24     Q. The railroad must use good engineering
25  practice, the practice that you employ, to be sure

83

1  that the track bed does not create the backwater
2  situation that endangers people in subdivisions?
3      A. Yes.
4      Q. Okay. And it trains its employees to be
5  sure to recognize that problem and to report it as
6  you and I have described and discussed?
7      A. Yes.
8      Q. If the railroad decides to close a trestle
9  in an area like this, they must use good
10  engineering practice to determine whether or not
11  the closing would adversely affect those people
12  adjacent to the track?
13         MR. MCKAY: Object to form. Go
14  ahead.
15         THE WITNESS: Close? Again, is
16  your --
17  BY MR. SWINDOLL:
18     Q. Close a track -- I mean remove a trestle.
19     A. Let's re -- you mean remove?
20     Q. Remove a trestle.
21     A. Yes.
22     Q. If they're going to remove a trestle --
23     A. Uh-huh.
24     Q. -- they must use good engineering practice
25  to be sure that they're not increasing the danger

84

1  to the people around the track?
2      A. Yes.
3      Q. And that is part of the safety is
4  paramount for Union Pacific that we already
5  described and discussed? That's the area we're
6  talking about?
7      A. That's a piece of it, yes, sir.
8      Q. And if the railroad determines that the
9  rail bed is holding water back and endangering a
10  subdivision, must it do something about it?
11         MR. MCKAY: Object to form and
12  foundation. Go ahead.
13         THE WITNESS: Do something, yes.
14  What that something is, it may be just driving out
15  there and, Oh, a beaver dam; hand me my shovel.
16  BY MR. SWINDOLL:
17     Q. Right.
18     A. Do we do something?
19     Q. Yes.
20     A. I always take action, yes.
21     Q. Okay.
22     A. Whether that's a major action or I can fix
23  this myself --
24     Q. Right.
25     A. -- but, yes, an action would be taken.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                              July 14, 2011

85

1    Q.  Now, did you visit in October and December
2  this area when you heard about the water up against
3  the track?
4    A.  No.
5    Q.  Okay.  So if I showed you pictures of the
6  people working, you won't be in those pictures, and
7  you didn't see them working out there?
8    A.  No.
9    Q.  You do know what they did, obviously, from
10 our discussions?
11   A.  Yes, I do.
12   Q.  Okay.
13   A.  But, no, I'm not in the photos.
14   Q.  Now, the next level of discussion for us
15 has to do with -- I understand that you and other
16 UP officials met with the City of Beebe after the
17 flood in 2009?
18   A.  That's correct.
19   Q.  Okay.  Were you present during those
20 discussions?
21   A.  Yes.
22   Q.  Who was present there that we can describe
23 and discuss?
24   A.  There were three separate instances that I
25 recall, and the parties were different, I believe,

86

1  all three times.
2    Q.  Okay.  What was it that the City of Beebe
3  was asking Union Pacific to do?
4    A.  The City of Beebe was represented by Mayor
5  Robertson there at least for the first two
6  meetings.  The third meeting, there was another
7  party there.  The first two meetings -- actually he
8  was in all three.  Mayor Robertson basically asked
9  us to look at the situation as far as drainage.
10   Q.  Okay.  And did they present you -- Don
11 Beavers, did you discuss with Don Beavers, the city
12 engineer, about the drainage in this situation?  Do
13 you remember discussing with him?
14   A.  There was an individual present at the
15 third meeting, and I don't recall his name.
16   Q.  Okay.
17   A.  That may have been the gentleman at
18 meeting number three.
19   Q.  We talked about Mayor Robertson, and we
20 talked about you --
21   A.  Uh-huh.
22   Q.  I think there's another UP official who
23 may have been at one or all three of these
24 meetings; is that correct?
25   A.  Yes.

87

1    Q.  His name is Drew something?
2    A.  Drew Tessier was at meeting three.
3  Meeting one was myself -- who was with me?  I had
4  one of my foremen with me, and I don't recall who
5  it was.  And in meeting two, it was just myself and
6  the mayor having a chat, and as I recall, that
7  second meeting was very brief.  It was about how do
8  I get a key to the gate to get in there to do some
9  maintenance.  And then meeting three was myself,
10 Drew Tessier, Mayor Robertson, and that third party
11 who was an engineer for the city, and I don't
12 recall if that's the proper name, if that was him
13 or not.  It could well have been.
14   Q.  Okay.  In your own words describe that
15 meeting and its purpose.
16   A.  The third one?
17   Q.  Uh-huh.
18   A.  Let me see what I remember.  I don't
19 remember why Drew came in on that one.  I
20 remember -- you know, it's not one of those things
21 when you're going there, you sit there and take
22 notes because you don't think you're going to get
23 quizzed on it years later.
24       I remember going in and opening up with,
25 The railroad wants to be a good neighbor.  We want

88

1  to do what we can for the city, that -- that there
2  were as many -- as manager of bridge maintenance, I
3  could call Omaha, ask to look into the drainage
4  studies there and had the ability to put any
5  modifications, replacements, additions, removal of
6  bridges that were warranted by a hydraulic study of
7  the current situation with the subdivisions and
8  levees and forests and anything else that's come up
9  in recent times, taking into account that may not
10 have been --
11   Q.  Uh-huh.
12   A.  -- in prior studies to determine if our
13 bridges are providing accurate outflow, and in
14 cases of backwater situations, are they blocking it
15 sufficiently, coming back into the property, that
16 we are providing the maximum safety we could to the
17 public.
18   Q.  Okay.
19   A.  That was the main -- if I remember the
20 thrust I went in there to convey.
21   Q.  Uh-huh.  And at the time you had -- you
22 met with the mayor, had you done any study or made
23 any visits or made any preliminary determination on
24 your own?
25   A.  I had visited the site between December



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                            July 14, 2011

89

1    and the meetings with the mayor, and the
2    determination I made at the time was the emergency
3    repairs made by the track department -- they had
4    come in with a, quote, riprap train, which is a
5    train full of boulders, basically, and dumped it
6    all around there when they rebuilt the ballast and
7    sub-ballast that had washed out, and they put
8    riprap all over the place, and in doing so had
9    reduced the hydraulic opening under that 314.88
10   bridge.
11       Q.  Okay.
12       A.  What I wanted to do was at least get the
13   riprap that they dumped in the flow channel back up
14   on the embankment so that we were not changing that
15   flow area significantly by the dumping of riprap
16   under the bridge.  I mean, it's just like why would
17   I come in and put plywood up under three spans and
18   reduce the opening to this big.  It's the same
19   thing by piling riprap; you're reducing the flow,
20   so I went and -- I went and visited and identified
21   that problem, figured out how to solve it, got the
22   equipment needed to do so, and came across that
23   locked gate, and that was the meeting number two
24   situation, so, yes, I visited several times to
25   accomplish that.

90

1        Q.  Okay.  Now, the discussion and description
2    that you just provided us about this closing of the
3    channel --
4        A.  Uh-huh.
5        Q.  -- that had been done when the repair was
6    in October or in December?
7        A.  That was done in Dec-- -- it was actually
8    after Dec- -- well, it may have been the last week
9    in December, but Christmas Day was the flood --
10       Q.  Right.
11       A.  -- and I think we got it open within a day
12   or two, so it would have been done in December of
13   '09.
14       Q.  Okay.
15       A.  No work was done -- no damage was done in
16   the October issue in that area.  I was in the south
17   end of the state where that extraordinary rain
18   event wiped out three abutments down in Stamps,
19   Stephens, and Lewisville, Arkansas, so -- but
20   nothing -- nothing was damaged in the hoxie sub
21   during the October event.
22       Q.  Okay.  During the meeting with the mayor,
23   was any resolution reached with the mayor of Beebe
24   and Union Pacific about what would be done or how
25   it would be done?

91

1        A.  Basically, I told them what I could offer,
2    as a representative of the railroad, that I would
3    get a hydrology study started through our office in
4    Omaha -- which as a matter of course, that's a
5    normal procedure -- take a look at that, bring
6    them, you know, what the results were and where I
7    could take it from there.
8            Whatever that study showed, I would put on
9    the -- the way that works is the manager of bridge
10   maintenance recommends three years out which
11   bridges need to be modified, replaced, removed,
12   whatever.
13       Q.  Okay.
14       A.  So that was in 2010, so they would have
15   been on the 2013 replacement program or removal
16   program or whatever; whatever program was
17   appropriate for what the current field study showed
18   of the hydrology conditions there.
19       Q.  At that time or any time since then, have
20   you learned that there are any plans to change the
21   current drainage in this area, sir?
22       A.  No, there are not; and primarily that came
23   about because your clients brought suit and at that
24   point it's in the lawyers hands.  I can't change
25   anything.  The conversation is between the lawyers,

92

1    and I can't change the situation because the result
2    of the suit may force me to do something different.
3        Q.  Okay.  Did the money, $3 million -- did
4    that number ever come up during this meeting?  Do
5    you know?  Do you remember the term "$3 million"?
6        A.  No, no.
7        Q.  Whoever mentioned it at any point?
8        A.  It didn't stick if it was in there.
9        Q.  I'm sorry?
10       A.  It didn't stick in my mind if it was
11   mentioned, no.
12       Q.  Okay.  Did you visit in December when the
13   water was up?
14       A.  No.
15       Q.  Okay.
16       A.  No.  Unfortunately, the water was -- that
17   was such an unusual rain event that the -- at the
18   end of my subdivision road, there was an antenna
19   sticking up from a car.  I decided not to try to
20   get out of my subdivision.  I had to handle that
21   incident by phone.
22       Q.  By "subdivision," do you mean the hoxie
23   subdivision?
24       A.  No.  I mean the one I lived in where -- a
25   bunch of homes -- a bunch of homes on a street.



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

93

1    Q. I got you.
2    A. Yeah. It kind of dipped at the end of the
3  road there, and there was a car antenna sticking
4  out of the water, and I decided I was not going to
5  attempt that, so flooding was not only where that
6  hoxie is, but it was pretty widespread.
7    Q. Okay. Final line of questioning: I have
8  just one more document. I can't find it. We're
9  going to use the document I've been working with.
10  It's 1390 -- it's 1393, it's a UP document showing
11  in this area a change in a bridge.
12    A. That's more than a change; that's a
13  replacement.
14    Q. That's the word we could use --
15  "replacement."
16    A. This is a replacement, yes.
17    Q. Okay. Is this in the area that we're
18  talking about?
19    A. Yeah. Let's see where this is. 316.74 --
20  so it is actually circled here on this Exhibit
21  No. 3 in red.
22    Q. Okay. Would you just mark a star by that
23  one.
24    A. Star is the mark of the day. How's that?
25    Q. Okay. Tell us what was done based upon

94

1  these engineering drawings and when it happened?
2    A. All right. Well, I can't tell you -- I
3  can tell you when it was designed, but probably not
4  when it was built.
5    Q. Okay. It was obviously designed before it
6  was built; can we agree on that?
7    A. Thank goodness, yes.
8    Q. Yeah.
9    A. That would be the normal order of things.
10  So let's see if I can raise a date here on this
11  little set of drawings. Work order number, no
12  revisions -- I'm looking for a date, and I don't
13  see one.
14    Q. 1996 is where I --
15    A. Oh, wait a minute, wait a minute. There's
16  a signature here and next to that is a date, and
17  that looks like August 22nd of 1996.
18    Q. Okay. Great.
19    A. So --
20    Q. Could you just use your engineering
21  expertise and tell us what the railroad did when
22  they replaced this trestle?
23    A. All right. Let's see what we've got.
24  Doesn't say what we took out, no change in profile.
25  The general drawing -- "construction notes," "field

95

1  verify," these are standard notes.
2    Q. There's a template that describes the
3  overall procedure and it says something like -- let
4  me show it to you for a second.
5    A. Yeah. Let's see where you're driving at
6  here, so I don't waste all of our time.
7    Q. It says right here --
8    A. Sure.
9    Q. Yeah. That template --
10    A. Here you go. Okay. This is a title --
11  title block is what that's called. So we replaced
12  an existing 9-span, 119-foot timber pile trestle
13  ballast deck is what the TPD -- "...TBD" stands
14  for.
15    Q. Uh-huh.
16    THE WITNESS: Did you get "TPT..."?
17  I know that's hard to do (indicating).
18    A. And we were replacing it with a 2-span
19  concrete box girder.
20  BY MR. SWINDOLL:
21    Q. Did you reduce the size of that trestle
22  when you replaced it, sir?
23    A. Would we reduce the size, yes.
24    Q. Tell us what size it was and what you
25  reduced it to.

96

1    A. Well, it calls for 119 foot to be removed.
2  Okay. Now, that's the length, and we replaced it
3  48 foot 8 for the length.
4    Q. So that means we lost 56 feet of drainage
5  or whatever number that is if we took the two
6  differences, 116 minus -- I mean, can we do that?
7    A. That's not how drainage is described.
8  It's in square foot versus linear foot, but we --
9    Q. Okay.
10    A. -- but we reduced the hydraulic opening.
11    Q. Okay.
12    A. Now, with that said, it clearly shows
13  here, I don't know if you've noticed these two
14  little items, and we could circle them if you want.
15  There's the hundred-year flood, the 50-year flood
16  and we're 2 foot above it, so it meets current
17  design standards.
18    Q. Okay.
19    A. So that's -- that's what the hydraulic
20  study is indicated on current plans. It's not on
21  these old drawings.
22    Q. Okay. But it clearly shows us that
23  whatever design standard it met, UP, in 1996,
24  reduced 119 feet to 48 feet 8 inches?
25    A. Correct.



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                    July 14, 2011

97

1    Q. So then, in sum, we know that this
2  trestle, the one marked X on our diagram, was
3  reduced --
4    A. Uh-huh, the star, yeah.
5    Q. And we know that the ones A and B were
6  completely closed?
7    A. Yes.
8    Q. So if we wanted to know how much area for
9  drainage was -- been lost during UP operations over
10  the last 30 years --
11    A. Uh-huh.
12    Q. -- we could add up the feetage (sic) --
13  115, 116, and whatever number this is -- and that's
14  drainage that's gone.
15    A. "Drainage" may not be the proper term.
16  "Hydraulic opening" would be the engineering term.
17  We have reduced the hydraulic opening would be a --
18    Q. If I tell you that was 37 percent of
19  the existing drainage has been (sic) ceased or
20  closed or reduced, would you say that that's --
21  strike that question.
22    A. Yeah. An engineer is not going to guess
23  at that. Engineers like hard numbers.
24    Q. Right.
25    A. We're not going to go there.

98

1    Q. But if we added those numbers up --
2    A. Uh-huh.
3    Q. -- can we agree that if we added all the
4  openings in the trestles that exist now --
5    A. Yes.
6    Q. -- and divided that number into the amount
7  of trestles that were closed or reduced, we would
8  have a percentage of the amount of spaces that have
9  been closed by UP for one reason or another?
10    MR. MCKAY: Object to form, but go
11  ahead.
12    THE WITNESS: The number could be
13  calculated.
14  BY MR. SWINDOLL:
15    Q. Okay. And if I tell you it's 37 percent,
16  we're going to need to get a calculator out to do
17  that, right?
18    A. I'd like to sit down with all the drawings
19  and have time to do it properly because that's how
20  engineers are. You're just going to have live with
21  us that way.
22    Q. And those numbers are part of the UP
23  records that show people like you what was in the
24  past and what currently exists?
25    A. Yes.

99

1    Q. And based upon those numbers, UP does not
2  believe that there is an issue with respect to
3  drainage in this area?
4    MR. MCKAY: Object to form,
5  foundation, but go ahead.
6    THE WITNESS: I would say the fact
7  that UP doesn't object is right here on this
8  document that you just produced that shows under
9  the '96 flood evaluation performed for this bridge,
10  we are at least two foot clear of the hundred-foot
11  elevation with this opening, and that would include
12  the fact that these two missing bridges are gone.
13  BY MR. SWINDOLL:
14    Q. All right. Are you aware that water came
15  back to the subdivision in late April and early May
16  of this year?
17    A. Somebody mentioned that. I was talking --
18  I can't tell you who, but somebody said that it
19  backed up or got high during another unusual rain
20  event recently, yes. I can't swear to the date or
21  how high or anything. I don't believe they said
22  there was any damage, but --
23    Q. If --
24    A. -- somebody I talked to back in Arkansas.
25  One of my maintenance guys who used to work for me

100

1  did say that the water came up again.
2    Q. Do you know that it got back into the
3  houses again in May?
4    A. That I didn't -- our guys would not go out
5  in the subdivision. We would -- again, our -- it
6  was our -- I think it was the bridge inspector that
7  I was talking to about another item, and that came
8  up. And I think he said it came up again, but he
9  wouldn't go out in the neighborhood. He's got
10  bridges to look at.
11    MR. SWINDOLL: Thank you,
12  Mr. McKenna. That's all I have today.
13    THE WITNESS: That's all?
14    MR. MCKAY: Just a couple follow-up
15  questions --
16    THE WITNESS: Certainly.
17    MR. MCKAY: -- on some things that
18  you mentioned.
19    CROSS-EXAMINATION
20  BY MR. MCKAY:
21    Q. There was recent testimony in the case
22  from one of the witnesses that the plaintiffs have
23  listed as a witness, Bill Thompson --
24    A. Okay.
25    Q. -- who said that after this 1983 farm



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Phillip McKenna                                                July 14, 2011

101

1    burned, the landowner, Mr. Guyot --
2        A.   Uh-huh.
3        Q.   -- who owns the land north and west of the
4    railroad tracks --
5        A.   All right.
6        Q.   -- entered into a government program to
7    plant pine trees where he was paid or subsidized to
8    plant trees and not cultivate the land in this
9    area.
10       A.   Okay.
11       Q.   Would planting trees like that have any
12   kind of impact on the drainage of the water or the
13   water backing up on the north and west side of the
14   tracks?
15       A.   Yeah, absolutely.  The area where the
16   subdivision is, water is going to flow much more
17   freely.  There's two reasons.  One is called the
18   roughness coefficient that's input into the
19   calculation.  The roughness input of smooth paved
20   driveways and roads and roofs and all that is very
21   low; whereas, a pine -- a stand -- a stand of pine
22   trees, it would be very high for the water to run
23   off simply because of the way the -- there's pine
24   trees everywhere; there's branches on the ground;
25   the roughness coefficient goes way up.

102

1        The other item it would affect is
2    something called the time of concentration; and the
3    way that works, the time of concentration, is it
4    rains here, your structure you're calculating for
5    is down here, how long does it take for it to get
6    from A to B?  That's the time of concentration, and
7    that would certainly be increased by a grove of
8    pine trees planted.
9        MR. MCKAY:   Okay.  And then -- may I
10   use this photo?  Is this one I can attach?  Let me
11   label this as exhibit -- which exhibit number are
12   we on?  6?
13       (Exhibit Nos. 6 and 7 were marked for
14   identification.)
15       (Whereupon a brief discussion was held
16   off the record.)
17   BY MR. MCKAY:
18       Q.   Okay.  Instead of Exhibit 6, I'm going to
19   ask you about Exhibit 7 now --
20       A.   Okay, which is a picture.
21       Q.   -- a photograph, and I wanted to see if we
22   can get this in the camera.  Mr. Thompson also
23   testified -- just to get you oriented, the
24   neighborhood is back in this area --
25       A.   Okay.

103

1        Q.   -- that direction is north; this is south.
2        A.   Okay.
3        Q.   That is the bridge right there --
4        A.   That's 314.88.
5        Q.   Right.  Where the -- I don't know if
6    that's the number -- that's where the work was done
7    in December 2009.
8        A.   Okay.
9        THE VIDEOGRAPHER:   Excuse me,
10   Counsel.  Phil, can you tilt that a little bit for
11   me?
12       THE WITNESS:   Getting a shine or
13   something?
14       THE VIDEOGRAPHER:   Yeah.  Thank you,
15   sir.
16   BY MR. MCKAY:
17       Q.   And this structure that is on the east
18   side of the tracks, which is -- appears to be a
19   levee or a road.  Do you see where I'm talking
20   about?
21       A.   Yeah.  Your -- this downstream levee out
22   here.  There's woods and then a levee that I've
23   seen out there, yeah.
24       Q.   Okay.  Mr. Thompson said at the time the
25   bridge burned in 1980(sic), this levee was not

104

1    there.  What impact would that have on the flow of
2    water and the drainage from the west side of the
3    tracks?
4        A.   In drainage from the west side, that could
5    impede the flow by raising -- there's a section
6    here -- obviously, we're raised and the levee's
7    raised, so you're creating some sort of
8    bathtub-type situation here where that water level
9    may raise during a significant flow of water,
10   either backwater from, I believe, over here,
11   Cypress Bayou, down here a little bit.  Backwater
12   from that could raise this bathtub up impeding
13   outflow through this bridge right here, so that's a
14   possibility.
15       Q.   The outflow under that bridge has to make
16   a turn to go around --
17       A.   Uh-huh.
18       Q.   -- that levee structure, will that affect
19   the outflow underneath the bridge?
20       A.   It will, it will.  A sharp turn like that,
21   it's not that distant between our outflow and that
22   actual levee there, so, yes, that will also slow
23   the flow from the bridge.
24       Q.   All right.  Can developments, houses,
25   streets, that type of thing, affect water flows,

Toll Free: 800.852.9737
Facsimile: 214.954.4111

ESQUIRE
an Alexander Gallo Company

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                           July 14, 2011

105

1    flow rates, drainage, et cetera?
2        A.  Of course.
3        Q.  Okay.  And how does that affect --
4        A.  It depends on the design of it, but the
5    primary impact is it increases the outflow more
6    quickly, reducing the time of concentration and the
7    rate of runoff is increased simply because you're
8    channelling it now.  You're taking it off of roofs,
9    into gutters, down spouts, down into storm drains,
10   if they're present, out on pavement.  You know, and
11   again, there's your perfect example, your grove of
12   pine trees.
13           You're going to significantly -- if you
14   develop the land and pave part of it, you're
15   significantly decreasing that Manning's Roughness
16   Coefficient, and increasing the outflow and it will
17   concentrate much more quickly into wherever it's
18   heading.
19           MR. SWINDOLL:  Joe, can we take a
20   short break?  I'm so sorry.  I have to take a
21   break.
22           MR. MCKAY:  Okay.
23           THE VIDEOGRAPHER:  Time is 10:56 a.m.
24   Counsel, we're off the record.
25           (Whereupon a brief recess was taken.)

106

1            THE VIDEOGRAPHER:  This is beginning
2    of Videotape No. 3.  The time is 10:59 a.m.
3    Counsel, we're back on the record.
4    BY MR. MCKAY:
5        Q.  Union Pacific has been sued in this case.
6    In part, plaintiffs are alleging -- at least we
7    think they're alleging that removing these two
8    bridges and filling them in caused the flood and
9    that Union Pacific was negligent for doing that.
10           My question to you is, between the time
11   this railroad was designed, which I think the track
12   profile says 1873, 1893, and when those bridges
13   were removed in either '72 or '80, are there things
14   that may have changed that would impact the
15   decision as to whether it was okay to remove those
16   bridges?
17       A.  Yes.
18       Q.  For example, what would be some things
19   that would change?
20       A.  Some that come right to mind -- change of
21   land use.  For example, that individual you were
22   talking about planting trees, installation of
23   subdivisions, changing the runoff rates, building
24   of the highway system there, 167/67.  Just like us,
25   that's a natural dam with openings in it that are

107

1    planned, more paving, building of levees.  I could
2    think of those things right off that change the
3    drainage of that area significantly since the 1800s
4    when it was undeveloped land.
5        Q.  And the -- you mentioned the building of
6    levees.  What comes to my mind is the flood of
7    1937 --
8        A.  Uh-huh.
9        Q.  -- most of Arkansas flooded and the levee
10   system was created and built.  Is that something
11   that can change the hydraulics and the way the
12   water flows?
13       A.  Well, yeah.  Anytime you build a levee,
14   it's designed to change the way water flows, yes.
15       Q.  Okay.  And you mentioned the effect the
16   railroad may have on backwater as it relates to
17   this neighborhood --
18       A.  Uh-huh.
19       Q.  Does the railroad actually protect the
20   neighborhood from a backwater flooding event?
21       A.  It would act as a natural levee with,
22   again, controlled openings for the opposite
23   situation.  And in headwater flow, and -- but, yes.
24   In a backwater situation, if the water were to get
25   high on the opposite side of the railroad from the

108

1    subdivision, the limited number of openings in
2    basically what amounts to another levee, even
3    though it carries railroad tracks, would slow down
4    the flow into the developed neighborhood and any
5    other items on the other side of the tracks, so,
6    yes.
7        Q.  When you add bridges in that scenario
8    and --
9        A.  Uh-huh.
10       Q.  -- add openings --
11       A.  Uh-huh.
12       Q.  -- does that, in fact, increase the water
13   flow in a backwater flooding event from the
14   downstream side to the upstream side?
15       A.  Yes, yes.
16       Q.  And you mentioned you have an engineering
17   degree.
18       A.  Yes, sir.
19       Q.  And where is your engineering degree from?
20       A.  Graduated in 1983, Bachelor of Civil
21   Engineering from Southern Technical Institute.
22       Q.  Okay.  And that's a bachelor of science
23   degree?
24       A.  Yes.
25       Q.  All right.  And then you've worked for



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                                    July 14, 2011

109

1   several different railroads in your career?
2      A.  Uh-huh, yes.
3      Q.  What are the different railroads that
4   you're worked for?
5      A.  The two railroads -- I've been in bridges
6   since day one of graduation.  I've -- the two that
7   were railroad associated, I worked for the
8   Metropolitan Atlanta Rapid Transit Authority from,
9   goodness, 16 years, whatever it amounted to -- 11
10  years?  Anyway, a while down there at the
11  Metropolitan Atlanta Rapid Transit Authority.
12     Q.  But as an engineering professional, you've
13  been working in the area of bridge design,
14  consideration of water flow --
15     A.  Uh-huh.
16     Q.  -- et cetera, for essentially your entire
17  career?
18     A.  Since 1983 I've been in either bridge
19  design, bridge construction, bridge inspection,
20  bridge maintenance, and now bridge planning.
21     Q.  Okay.  There has been some testimony by
22  Milton McCullar in the case where he said -- I
23  believe it was after the October 2009 flood, he saw
24  vegetation under one of the bridges in the
25  waterway.  He described it as grass and weeds and

110

1   brush.
2      A.  Okay.
3      Q.  What impact does that type of
4   vegetation -- grass, weeds, brush -- have on water
5   flows?
6      A.  Basically none.  Vegetation of that under
7   high flow times such as the extraordinary events
8   we're seeing here, that stuff just lays down on the
9   bottom of a -- of the stream bed.  It doesn't -- it
10  doesn't impede it at all.  If it's a standing water
11  situation, it acts a little like a comb, and has a
12  minor effect; but once you get a high flow through
13  there, it just lays down flat on the stream bed.
14     Q.  What kind of vegetation would you have to
15  have in order to actually restrict flow under a
16  bridge or a trestle?
17     A.  In my practical experience, you've got to
18  have two significant trees to grab something.
19     Q.  Describe what you mean.
20     A.  Basically you have to have two
21  obstructions like this that can grab either a large
22  branch, or we've seen refrigerators, car hoods,
23  boats, anything like that.  Once you get a large
24  object like that, it starts to build and obstruct
25  the flow.  The actual stick in the water -- take an

111

1   analogy like sticking a stick in the water.  Even
2   if it's flowing fast, you can hold it.  Take a
3   sheet of plywood and try to drop it down in the
4   water, you can't hold it; you're going.  And that's
5   kind of a simple analogy --
6      Q.  Okay.
7      A.  -- as to what I'm describing.
8      Q.  Okay.  And so you mentioned if you had two
9   trees there that could trap an object or other
10  debris, trees -- when that debris backs up and
11  stacks up that's when you begin to have --
12     A.  That's when it's time to take action, yes.
13     Q.  Okay.  You and I have had some discussions
14  about Mr. Don Beavers, and he has testified in this
15  case that he determined that the water level on the
16  east side of the tracks was lower than the water
17  level on the west side of tracks after the December
18  flood by going down, and he said he observed pine
19  needles in the trees.  Is observing pine needles an
20  accepted methodology in engineering for determining
21  a high water level?
22     A.  No.  And there's a variety of reasons.
23  That's certainly not an accepted scientific or
24  engineering practice to look at debris in trees.
25  The primary reason is we don't know when it was

112

1   deposited.  Was it deposited on the way up as
2   waters rose?  Was it like a ring around the
3   bathtub, and as it came down, all of a sudden the
4   water movement was stagnant enough that it started
5   to deposit things?
6      It's just not an accepted scientific or
7   engineering practice to say, Okay, pine needles are
8   in the tees at this height; that's how the high the
9   water got.  You're just not going to find an
10  engineer to certify that.
11     Q.  So as water is flowing, oftentimes debris
12  is not going to get caught on leaves or trees, but
13  it's when it flows down and becomes stagnant --
14     A.  Uh-huh.
15     Q.  -- which is after it's fallen --
16     A.  Correct.
17     Q.  -- is when you may have something like a
18  pine needle hanging in the trees?
19     A.  Correct.  Just like the ring around the
20  bathtub.  As it's stagnant and it starts to go
21  down, it starts to deposit.
22     Q.  Okay.  And there was testimony from Bill
23  Thompson that a 1980 flood that was removed, he
24  said it appeared to go over land that was the same
25  level as the adjoining field.  It did not appear to

Toll Free: 800.852.9737
Facsimile: 214.954.4111

ESQUIRE
an Alexander-Gallo Company

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                              July 14, 2011

113

1   be a waterway --
2       A.  Uh-huh.
3       Q.  It did not appear to actually go over a
4   creek or a channel?
5       A.  Okay.
6       Q.  Is that significance -- is that
7   significant in as far as a factor to consider when
8   closing a bridge?
9       A.  Yeah.  That's something -- if I were to
10  take a bridge and fill it in, I would certainly
11  look at the situation.  We're looking at that on
12  Exhibit 5, and we see a section that's lowered, and
13  you're bringing in the possibility that there's no
14  channel there, which tells me we may be guessing
15  correctly about farm equipment going under there;
16  but I would certainly -- yes, I would consider that
17  when I called Omaha and said I've got a bridge
18  that's burned or been taken out by a derailment or
19  whatever.  What do I need to do as an emergency
20  measure, and tell them it doesn't look like water's
21  been through here for years or it's flowing like
22  crazy or it's just a factor that I would bring up
23  to the designer in Omaha when I needed to replace a
24  bridge.
25      Q.  And you, I believe, have told me before

114

1   that you went down to the bridge after -- when I
2   say the "bridge," I'm talking about the bridge that
3   had repairs to it as a result of the December 2009
4   flood.
5       A.  The bridge we didn't do any repairs to.
6   It was the trackway adjacent to the bridge washed
7   out.
8       Q.  The area that was repaired, you went down
9   to it?
10      A.  I did.
11      Q.  After it had already --
12      A.  After the flood subsided, yes.
13      Q.  And did you see any vegetation issues when
14  you went down and looked at the bridge at that
15  time?
16      A.  No.  That's the same visit I was
17  discussing earlier where I went down and discovered
18  they dumped too much riprap, and it was time to get
19  that out of the channel; but vegetation was not an
20  issue.
21      Q.  But that riprap -- riprap was successfully
22  removed?
23      A.  It has been successfully removed and
24  placed on the bank, yeah.
25      Q.  And then I believe you told me also that

115

1   sometime in the late summer of 2009 you would have
2   been down through this area?
3       A.  I was down through there, yes.
4       Q.  Okay.  And did you -- was -- were there
5   any vegetation issues in the area at that time with
6   any of the trestles?
7       A.  No vegetation issues that would impede
8   flow.  There was small weeds and reeds and maybe
9   a -- I don't know what you call those bushes that
10  grow up in that area, but they're small bushes;
11  but, again, those are the type, after the flow in
12  Christmas, had just laid over.  It did not impede
13  the flow.
14      Q.  In your discussion, you mentioned --
15  strike that.
16          You mention a discussion you had with
17  Mayor Robertson.
18      A.  Uh-huh.
19      Q.  And you said there was a discussion where
20  you had told him that you would look into -- at
21  least you'd be willing to consider at least
22  evaluating the issue.  Did Mayor Robertson say
23  anything to you about a group of homeowners that
24  was planning to file a lawsuit?
25      A.  Somewhere during the end of the meeting,

116

1   he did say that the City of Beebe was not going to
2   file a lawsuit; however, there was talk among some
3   group of homeowners led by one individual, I don't
4   know who that is, that they may be interested in
5   filing suit against the railroad.
6       Q.  Okay.
7       A.  Yes.
8       Q.  Was it during that part of the
9   conversation when you told the mayor that if that
10  happened it would be in the lawyers' hands and you
11  would be prevented from engaging in further
12  discussions?
13      A.  That's correct.
14      Q.  Okay.  Mayor Robertson made it sound like
15  you were making a threat to the mayor.  He
16  testified and said something to the effect that you
17  told him the railroad would agree to do something,
18  or at least look at it, but if anybody files suit,
19  the deal was off, and the railroad wouldn't do it.
20      A.  No.  That's not how I worded that and,
21  again, I went into that meeting and the first words
22  out of my mouth was, The railroad wants to be a
23  good neighbor.  We want to do what we can, if
24  there's something we can do.  And I believe what I
25  told them is that if a lawsuit is filed, it will be



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                    July 14, 2011

117

1   in the hands of the lawyers and our -- these
2   "friendly conversations," is I believe how I
3   phrased it with him -- these friendly conversations
4   will have to stop until the legal issues are
5   resolved.
6        Q.  Okay.  And since you've become involved in
7   this process, have you learned that these houses
8   are actually built in the hundred-year flood plain?
9        A.  Yeah.  According to the FEMA flood maps
10  that I've reviewed since, those houses are well
11  within the hundred-year flood plain.
12       Q.  And are you aware that some of those
13  houses were actually built below the hundred-year
14  flood plain?
15       A.  Yes, yes.
16       Q.  And that -- that the city actually failed
17  to follow the regulations concerning development in
18  a flood plain?
19       A.  Yes.
20       Q.  Okay.  And is that a -- this might be an
21  obvious question, but is that certainly something
22  that you would have to look at to consider if
23  you're trying to determine the cause of this flood?
24       A.  Yes.  You know, I don't sit around and
25  determine causes of floods as a bridge engineer,

118

1   but certainly when the railroad -- you know, had
2   the lawsuit not been filed and had we gone ahead
3   with the program, trying to get it on a 2013
4   program for evaluation and possible remediation, we
5   would look at those homes, even though they are
6   below the hundred-year flood plain to see if
7   there's something the railroad can do to lessen the
8   hundred-year elevation.
9        Q.  Okay.  But the railroad can't certainly
10  plan for extraordinary events like we had here, for
11  instance, where you had five to ten inches of
12  rainfall within 24 hours?
13       A.  My personal thing is no, we cannot; and I
14  think this '96 design showing that we've come two
15  foot above the hundred-year elevation, we are
16  planning for everything we can.  Extraordinary
17  events beyond that, we can't control flooding like
18  that, just like the flooding that's going on right
19  outside the door here.  Those are extraordinary
20  events, and you can't control them.
21       Q.  The railroad, I presume, travels through
22  lots of hundred-year flood plains?
23       A.  Yeah.
24       Q.  And that's something where, I presume, the
25  railroad sees flooding certainly more often

119

1   there than other locations that are not in the
2   hundred-year flood plain?
3        A.  Yes.
4        Q.  And there's really nothing the railroad
5   can do about flooding in the hundred-year flood
6   plain?
7        A.  Not normally, no.  We really can't.  It's
8   a Mother Nature thing and we, as the Corps of
9   Engineers, and other major organizations have found
10  out you cannot control Mother Nature when the
11  hundred-year flood comes.
12            MR. MCKAY:  That's all I have.
13            MR. SWINDOLL:  Just a few follow-ups
14  as we finish.
15            THE WITNESS:  Sure.
16            REDIRECT EXAMINATION
17  BY MR. SWINDOLL:
18       Q.  One of things that I think we discussed
19  was which direction does the water flow.  If we put
20  St. Louis onto the left --
21       A.  Oh, sure, sure.
22       Q.  If we just do a big arrow that shows where
23  the water is supposed to flow from which direction
24  to which direction on the track --
25       A.  Okay.  Well, the main drainage in this

120

1   area is Cypress Bayou if we can find that on here.
2   They aren't labeled as to which ones they are.
3   Cypress Bayou is a 9-span reinforced concrete, so
4   water, primarily, if we do, it's all headed towards
5   Cypress Bayou and eventually the Mississippi from
6   there --
7        Q.  Okay.
8        A.  -- so this would be an approximation and
9   these big red arrows --
10       Q.  Right.
11       A.  And we can hold that up to the TV camera
12  if you want --
13       Q.  No.
14       A.  -- but that would be an approximation.
15       Q.  So, typically, the design would be from,
16  if we're looking at this, the arrows from this
17  direction to this direction across the track?
18       A.  That's correct.
19       Q.  And the trestles serve the purpose of
20  providing that they go from one side to the other
21  side?
22       A.  Correct.
23       Q.  Is the water flow supposed to be about the
24  same on both sides of the track?
25       A.  I'm not sure.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                    July 14, 2011

121

1    Q.  If water is flowing in your trestles --
2    A.  Yeah.
3    Q.  -- should the water be as high or higher
4  on the side it's flowing to or should -- is the
5  design such that it should be lower on this side?
6    A.  Except during a backwater situation, the
7  statement you've made is it's always going to be
8  higher on the upstream side, always.  Whenever you
9  convey it through an opening, always.
10   Q.  And the purpose of drainage is to be sure
11  that that's kept to a minimum?
12   A.  That that's kept to reasonable level.  I
13  don't know what minimum --
14   Q.  Reasonable level --
15   A.  Reasonable level sounds good to me as an
16  engineer.
17   Q.  Yeah.  Now, as part of your job, as you go
18  through looking at railroad facilities, the
19  railroad has to adapt to the circumstances that
20  grow up around the railroad, don't they?
21       MR. MCKAY:  Object to form as
22  speculation.  Go ahead.
23  BY MR. SWINDOLL:
24   Q.  I mean, you've talked about the trees and
25  you've --

122

1    A.  Well, sure we have to adapt to situations
2  all the time and not just this, yes.
3    Q.  Right.  In fact, the ones I can think
4  about are railroad signals, for example.
5    A.  Uh-huh.
6    Q.  The railroad has a buildup around one of
7  its crossings.  It increases the security in the
8  crossing by going from a crossbuck to a bar to
9  lights and whistles to all kinds of protections for
10  the people around that area; is that right?
11       MR. MCKAY:  Object to form.  That's
12  actually decided by the federal government.  The
13  railroad does not decide that.
14       THE WITNESS:  Well, Joe is correct --
15       MR. MCKAY:  Speculation.
16       THE WITNESS:  -- there's federal laws
17  there, but yes.
18  BY MR. SWINDOLL:
19   Q.  Yeah.  I mean, the point is it's just that
20  what you have to do is look at the circumstances
21  that exist then and then use good engineering
22  practices to determine what's best for the railroad
23  and the people who are adjacent to the railroad?
24   A.  And the best tools and techniques at the
25  time.

123

1    Q.  Right.
2    A.  Right.
3    Q.  Now, the trees that you've mentioned, do
4  you know why those trees were planted there, sir?
5    A.  No.  I don't know that farmer, and I don't
6  know what the situation was, but he -- you know,
7  apparently somebody has planted trees.
8    Q.  Yeah.  Do you know how old the trees are?
9    A.  No.  No, I don't know when that took
10  place.  I'm sure there may be a record of it, but,
11  you know, as the railroad guy, Okay, they're trees.
12   Q.  While you were talking about Exhibit 5, I
13  have one more circumstance that might have
14  developed when we said there's -- the testimony is
15  that at that time Bill Thompson said it was
16  straight across.  Is it possible that a stream bed
17  will fill up with silt over time?
18   A.  Absolutely.
19   Q.  And so when it was built, it might be a
20  stream bed.  Is the silt something that concerns
21  the railroad?
22   A.  Yes.  We remove silt as part of our
23  maintenance, yes.
24       MR. SWINDOLL:  Okay.  Thank you.  I
25  have no more questions.

124

1        MR. MCKAY:  Just one more question
2  about the flow diagram.
3        THE WITNESS:  Sure.
4        RECROSS EXAMINATION
5  BY MR. MCKAY:
6    Q.  You said, and that is on Exhibit 3, you've
7  shown the arrows flowing essentially, I think, from
8  the west to east direction?
9    A.  Essentially, yes.
10   Q.  But backwater flow would be opposite,
11  wouldn't it?
12   A.  Completely opposite, yes.
13       MR. MCKAY:  Okay.  That's all I have.
14       MR. SWINDOLL:  Thank you for your
15  courtesies today.
16       THE WITNESS:  All right.  Thank you.
17       THE VIDEOGRAPHER:  End of Videotape
18  No. 3.  The time is 11:19 a.m.  Counsel, we're off
19  the record.
20       THE COURT REPORTER:  And, Counsel,
21  what are your orders?
22       MR. SWINDOLL:  I need -- well, I need
23  synched as I said -- synched to this, synched to
24  that.  So, then, you can send me an e-transcript
25  and a copy.  He's going to sign, I guess.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

Phillip McKenna                                              July 14, 2011

125

1            THE COURT REPORTER:  What kind of
2   copy?  Condensed or full-size?
3            MR. SWINDOLL:  Yeah.  Full-sized.
4            MR. MCKAY:  And I'll take the same
5   thing.  The copy will have the exhibits with it?
6            THE COURT REPORTER:  Right.
7            MR. MCKAY:  So copy with exhibits,
8   e-transcript, and we would like a synched version
9   of the video.
10           (Adjourned - 11:20 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

127

1            AMENDMENT TO DEPOSITION
2       I, PHILLIP MCKENNA, wish to make the following
    changes in the testimony as originally given:
3
    PAGE LINE  SHOULD READ        REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9
10
11              WITNESS
12
13  _____
14           GENERAL NOTARY PUBLIC
15      IN WITNESS WHEREOF, I hereunto affix my
16  signature and seal this_____ day of
17  _____, 20_____.
18
19  My commission expires:
20
21
22
23
24
25

126

1              C E R T I F I C A T E
2   STATE OF NEBRASKA )
                      ) ss.
3   COUNTY OF DOUGLAS )
4       I, Leslie B. Anderson, Stenographic
5   Court Reporter, General Notary Public within and
6   for the State of Nebraska, do hereby certify that
7   the foregoing testimony of PHILLIP MCKENNA was
8   taken by me in shorthand and thereafter reduced to
9   typewriting by use of Computer-Aided Transcription,
10  and the foregoing one hundred twenty four (124)
11  pages contain a full, true and correct
12  transcription of all the testimony of said witness,
13  to the best of my ability;
14      That I am not kin or in any way
15  associated with any of the parties to said case of
16  action, or their counsel, and that I am not
17  interested in the event thereof.
18      IN WITNESS WHEREOF, I hereunto affix my
19  signature and seal this 26th day of July, 2011.
20
21  _____
22          LESLIE B. ANDERSON
            GENERAL NOTARY PUBLIC
23
24  My Commission Expires:
25

128

1   July 26, 2011
2   MR. PHILLIP MCKENNA
    UNION PACIFIC RAILROAD
3   1400 Douglas Street, Stop 0910
    Omaha, Nebraska 68179-0910
4
    Dear Mr. McKenna:
5       You have elected to read and sign your
    deposition taken on July 14th, 2011.
6       Enclosed please find a transcribed,
    condensed copy of your deposition and separate
7   correction page.  THIS IS A VALUABLE DOCUMENT, so
    please take a few minutes at this time to do the
8   following:
9       1.  Read your deposition thoroughly.
    Photocopying or other reproduction of this document
10  without the express consent of Thomas & Thomas
    Court Reporters is strictly prohibited.
11      2.  Make corrections only on the
    enclosed, separate correction page entitled
12  "AMENDMENT TO DEPOSITION."  Do not make corrections
    on the condensed transcript.
13      3.  Sign in the spot indicated as
    "WITNESS" on the page entitled "AMENDMENT TO
14  DEPOSITION" and have that page notarized by a duly
    licensed Nebraska Notary Public.
15      4.  Please return the separate
    correction page with or without corrections within
16  30 days to the Office of Thomas & Thomas Court
    Reporters, 3861 Farnam Street, Omaha, Nebraska
17  68131.  Failure to read and sign and return within
    30 days will result in delivery of the Original
18  Deposition without signature, and signature will
    have been deemed waived by the witness.
19      Sincerely,
20
21
    _____
22          LESLIE B. ANDERSON
            COURT REPORTER
            GENERAL NOTARY PUBLIC
23
24  Copies to:
25



Toll Free: 800.852.9737
Facsimile: 214.954.4111

Suite 4750
1700 Pacific Avenue
Dallas, TX 75201
www.esquiresolutions.com

AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

EASTERN     DISTRICT OF     ARKANSAS

DERRICK SEYMORE, et al

V.

UNION PACIFIC RAILROAD CO

## EXHIBIT AND WITNESS LIST

Case Number:  4:10-CV-00239 BSM

| PRESIDING JUDGE<br>Brian S. Miller | | | | | PLAINTIFF'S ATTORNEY<br>James F. Swindoll | DEFENDANT'S ATTORNEY<br>T.J. Fowler & Jospeh McKay |
|---|---|---|---|---|---|---|
| TRIAL DATE (S)<br>9/12/2011 - 9/17/2011 | | | | | COURT REPORTER | COURTROOM DEPUTY |
| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES | |
| 1 | | | | | Photographs taken by Milton McCullar | |
| 2 | | | | | Origianl plat for Windwood Meadows | |
| 3 | | | | | Randy Richardson correspondence | |
| 4 | | | | | May 10, 2001, letter from Donald Ward, Mayor of Beebe | |
| 5 | | | | | Letter from Mayor Robertson to families in Windwood Meadows | |
| 6 | | | | | Drawings of trestles existing and non-existing | |
| 7 | | | | | seller property disclosure sheet | |
| 8 | | | | | documents received from the City of Beebe | |
| 9 | | | | | all documents produced by defendant | |
| 10 | | | | | documents received from the City of Beebe Flood Plain Administration | |
| 11 | | | | | photographs taken by Robertson | |
| 12 | | | | | surveys of each subject property; | |
| 13 | | | | | closing documents of each subject property; | |
| 14 | | | | | documents produced by Don Beavers; | |
| 15 | | | | | documents created by Randy Richardson; | |
| 16 | | | | | all exhibits to all depositions; | |
| 17 | | | | | documents from ASWCC; | |
| 18 | | | | | real estate contracts and disclosures from each party; | |
| 19 | | | | | plats of Winwood Meadows, Winwood Estates, Winwood Subdivision Phase 1-3 and Winwood Sout | |
| 20 | | | | | flood ordinance for City of Beebe; | |
| 21 | | | | | correspondence from Federal Emergency Management Agency(FEMA) to City of Beebe; | |
| 22 | | | | | correspondence from ASWCC; | |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

AO 187A (Rev. 7/87)    **EXHIBIT AND WITNESS LIST – CONTINUATION**

| | DERRICK SEYMORE, et al | vs. | UNION PACIFIC RAILROAD CO | CASE NO. 4:10-CV-00239 BSM |
|---|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 23 | | | | | all FEMA maps; |
| 24 | | | | | diagrams contained in each expert report; |
| 25 | | | | | expert reports of Bruney Lightle, Dr. David Mitchell and Rob Stallings; |
| 26 | | | | | CV's of Burney Lightle, David Mitchells and Rob Stallings; |
| 27 | | | | | all photos |
| 28 | | | | | all discovery responses from plaintiffs with attachments; |
| 29 | | | | | building permit for each property at issue; |
| 30 | | | | | all documents cited or referenced in any expert report; |
| 31 | | | | | all documents reviewed by any expert; |
| 32 | | | | | Custom Soil Resource Report for Lonoke and Prairie Counties, Arkansas and White County, Arkan |
| 33 | | | | | Authority for Expenditure – Missouri Pacific Railroad Company, August 26, 1980; |
| 34 | | | | | incorporation document for the City of Beebe – Winwood Addition; |
| 35 | | | | | Magnitude and Frequency of Floods in Arkansas, U.S.G.S. Water Resource Investigation Report, 9 |
| 36 | | | | | Forensic Meteorology Report of Dr. David L. Mitchell, PhD. on the Beebe, Arkansas historical storm |
| 37 | | | | | 2009 Rainfall Data – National Climate Data Center, Ashville, North Carolina; |
| 38 | | | | | National Flood Insurance Program – Program Description, August 1, 2002, FEMA, Federal Insuran |
| 39 | | | | | 10/31/75 correspondence from J. Robert Hunter, Acting Federal Insurance Administrator – Departm |
| 40 | | | | | Resolution No 293-R passed by City of Beebe (April 1, 1975) dealt with FIA issues; |
| 41 | | | | | Flood Hazard Map- White County, Arkansas – effective date June 7, 1977, - Community Plan No. 0 |
| 42 | | | | | August 18, 1981 correspondence from acting associate director of FEMA to the Honorable Ray Sin |
| 43 | | | | | Memorandum dated June 21, 1996, to Earl Smith, P.E., chief, Water Resource Management Divisi |
| 44 | | | | | correspondence dated July 11, 1996, from Michael J. Borngasser, hydrologist with ASWCC to the |
| 45 | | | | | correspondence dated December 31, 1999, from Michael J. Borengasser, hydrologist, with the AS |
| 46 | | | | | memorandum dated November 14, 2000, from Mayor Donald Ward to Allen Riding, code enforcem |
| 47 | | | | | City of Beebe Ordinance No.  2000-16, dated September 7, 2000; |
| 48 | | | | | City of Beebe Resolution No. 2000-179, dated September 7, 2000; |
| 49 | | | | | memorandum dated September 20, 2000, from Mayor Donald Ward to Allen Riding, Code Enforcer |

✎AO 187A (Rev. 7/87)  **EXHIBIT AND WITNESS LIST – CONTINUATION**

| | | | | | |
|---|---|---|---|---|---|
| DERRICK SEYMORE, et al | | | vs. | UNION PACIFIC RAILROAD CO | CASE NO.<br>4:10-CV-00239 BSM |

| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 50 | | | | | correspondence dated October 16, 2000, from Chris Colclasure, flood plain planner, ASWCC to the |
| 51 | | | | | correspondence dated January 10, 2001, from Randy Richardson, AR RPLS No 1331; |
| 52 | | | | | correspondence dated November 2, 2009, from Michael Borengasser to the City Clerk of Beebe; |
| 53 | | | | | correspondence dated April 30, 2001, from Chris Colclasure to the Honorable Donald Ward, Mayor |
| 54 | | | | | Certification dated May 1, 2001, from Donald E. Beavers, AR RLS No. 470; |
| 55 | | | | | correspondence dated April 9, 2002, from Michael Borengasser to the Honorable Donald Ward, Ma |
| 56 | | | | | City of Beebe Ordinance No. 2003-15, Flood Damage Prevention Ordinance dated August 28, 200 |
| 57 | | | | | FIRM-Flood Insurance Rate Maps, City of Beebe, White County, Map No. 0502230001A-6A, Febr |
| 58 | | | | | Elwood Insurance Study, City of Beebe, effective date February 4, 2005, FEMA 050223V000A |
| 59 | | | | | managing floodplain development of approximate zone A areas – a guide for obtaining and develop |
| 60 | | | | | high water mark measurement made by City of Beebe staff for homes impacted by October and De |
| 61 | | | | | all diagrams in Dr. Mitchell's report; |
| 62 | | | | | U.S.G.S. quadrangle maps; |
| 63 | | | | | Union Pacific right of way maps; |
| 64 | | | | | list of structures in flood plain created by Don Beavers; |
| 65 | | | | | location map of structures in flood plain, City of Beebe by Don Beavers; |
| 66 | | | | | Winwood flood area, City of Beebe by Don Beavers; |
| 67 | | | | | all documents produced by either party; and |
| 68 | | | | | Union Pacific bridge sketches. |
| 69 | | | | | vidoe tape of the subdivision in the 2001 flood |
| 70 | | | | | Union Pacific maps |
| 71 | | | | | photographs taken by plaintiffs at the time of the flooding in 2001, 2005, 2009 and 2011 |
| 72 | | | | | Union Pacific manuals provided in discovery |
| 73 | | | | | letters from the City of Beebe and Don Beavers to Union Pacific |
| 74 | | | | | |
| 75 | | | | | |
| 76 | | | | | |