```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
 2                      WESTERN DIVISION
     _____
 3   DERRICK and ANITA SEYMORE;
     SHANE SMITH; THADDEUS and
 4   KAY WINTERS; BRIAN and STEPHANIE
     PARKER; KEITH GRIFFIN;
 5   ARNOLD and SHELLY FELBERMAYER;
     JAMES and NORMA TAYLOR;
 6   GENE and EMMA ADAMS;
     CONNIE and STEWART KIRBY;
 7   GREGORY HORNESS; and
     ANTHONY and SHERRY HEALY;
 8   LINDA CRIDER; JOHNATHAN and
     RENEE GORDON                             PLAINTIFFS
 9
     VS.                 CASE NO. 4:10-CV-239 BSM
10
     UNION PACIFIC RAILROAD COMPANY           DEFENDANT
11   _____

12

13       ORAL DEPOSITION OF GEORGE STEWART KIRBY

14                    April 29, 2011

15   _____

16

17

18

19

20                     [] COPY

21

22

23            BUSHMAN COURT REPORTING
                620 West Third, Suite 302
24            Little Rock, Arkansas  72201
                   501.372.5115

25


                 BUSHMAN COURT REPORTING
```

1    Q     -- the community, and to look out for their

2    welfare as far as their properties are concerned?

3    A     That's correct.

4    Q     Okay.  And if the City failed to abide by the

5    federal law to establish the base flood elevation

6    before building your house, they would not be

7    fulfilling that duty; would they?

8              MS. GILBERT:  Objection; that calls for

9         facts not in evidence.

10   A     Yes, they are required to find the base flood.

11   Q     Okay.

12   A     As far I understand.

13   Q     Okay.  Okay.  And if they fail to do that, then

14   they are not living up to their duty to protect the

15   citizens and their property?

16   A     We could go into a long argument about that.

17   Q     Do you agree -- Just do you agree with that

18   statement or not?

19   A     I would before I started looking into this

20   matter.  But my understanding is it's just like even

21   though there are laws, elected officials do not have to

22   follow them.  They are discretionary.

23   Q     You think the federal laws that govern building

24   in a flood plain are discretionary?

25   A     All laws are discretionary.

1   Q     Why do you say that?

2   A     Because if you look over -- when someone tries to

3   sue a city, and if there is a law that says they have

4   to do a certain thing, and if they didn't do it, like

5   fixing a pothole, it's not necessary to fix a pothole,

6   from my understanding.

7   Q     Okay.  And what is that -- what is your

8   understanding -- Do you think the, the federal laws

9   that govern communities developing in flood plains are

10  optional, or do you think cities have to abide by

11  those?

12  A     By what I understand with FEMA, I don't see a

13  whole Lot of retaliation against cities that do not

14  abide by them.

15  Q     Okay.  And I understand that, but, but it would

16  still be in violation of the law if they didn't comply

17  with federal regulations; do you agree with that, or do

18  you know?

19  A     I am not a lawyer.

20  Q     Okay.  All right.  When you say FEMA -- how did

21  you phrase it, FEMA doesn't -- What did you just say

22  about FEMA?

23  A     Enforce regulations.

24  Q     What do you, what do you base that on, that FEMA

25  does not enforce regulations?  Why do you say that is

1   Q     What, what regulation are you talking about?

2   A     I assume it's 44, whatever the, the code that you

3  are claiming that the City must follow --

4   Q     Okay.

5   A     -- is the same one.

6   Q     And it's your opinion that that applies to the

7  railroad?

8   A     It's not my opinion.  That is FEMA's opinion.

9   Q     Somebody at FEMA told you that?

10  A     That is correct.

11  Q     Who has told you that, that that regulation that

12  governs community's developments and flood plains

13  applies to the railroad, which person?

14  A     There is a -- On the FEMA website there is a

15  thing called Ask the Expert.  I sent in a request, and

16  they replied.

17  Q     Okay.

18  A     Yes, all railroads are required to follow.

19  Q     Do you have a copy of that?

20  A     At home.

21  Q     Can you get that and produce it to us?

22  A     Yes, I can.

23  Q     All right.  Can you do that by next Friday?

24  A     Yes, I can.

25  Q     Okay.  Just give that to your lawyers --

1    Q      Did you take that to mean that he thought the

2    railroad was causing the flood problems?

3    A      Yes.

4    Q      Okay.  And that was -- When did he tell you that?

5    A      After the flood in November.  He had photographs

6    that he was -- he had printed off, and he was showing

7    me material that they had dumped.

8    Q      When you said "after the flood in November," did

9    you mean October or December?

10   A      After the October flood.  In November is when he

11   showed me the photographs.

12   Q      In November.  Okay.  But you believed early on

13   that the City had, had -- was to blame for this

14   flooding because they allowed structures to be built

15   below the 100 year flood plain; right?

16   A      That's correct, but at that time when I first

17   started all of this, I did not know that the railroad

18   had at one time had additional trestles which had

19   burned and they had filled in, which would have allowed

20   water to escape.

21   Q      Okay.  How -- Do you know how much water would

22   have escaped or how much water would have -- how much

23   the water would have been reduced had those trestles

24   been --

25   A      I'm not a hydrologist.

BUSHMAN COURT REPORTING

1    Q      What is the basis of your knowledge that the

2    flood plain administrator was a sideline job in all

3    places?

4    A      Because I believe it was in 2000, somewhere

5    between 2003 and 2000, maybe five or six, the State

6    started requiring flood plain administrators to be

7    certified.  Until that time there was really no

8    education or training for flood plain administrators.

9    Q      Well, there were guides for communities to follow

10   to establish base flood elevations before that time

11   period; right?  You have seen those?

12   A      Yes.

13   Q      Okay.

14   A      But you have asked me about the job itself.

15   Q      Well, okay.  So you assume just because there was

16   no formal training, and assuming that's true -- I don't

17   know if that's right or not -- but assuming that is

18   true, you assume that because there is no formal

19   training flood plain administrators were sideline jobs.

20   Nobody took it seriously.  It was not, not anything

21   anybody was concerned about?

22   A      That's correct.  I mean, that happened all of

23   over the state.

24   Q      Okay.  And that is based solely on the fact that

25   they --

```
 1    A      That's my assumption.  That is what I assume.

 2    Q      That is your assumption based on the fact that

 3    nobody was required to be certified --

 4    A      That's correct.

 5    Q      -- until what year?

 6    A      I believe it was 2005 or six.

 7    Q      Okay.  And what is that based on, the 2005 or

 8    2006 certification?  Where do you get that knowledge?

 9    A      From the Arkansas Resources Commission, who

10    oversees the flood plain administrators.

11    Q      Is there a document, or is there somebody you

12    talked to, or what is the -- if I were to go talk to

13    that person and say, Hey, did you say this, who do I go

14    talk to?

15    A      No, it was on their website --

16    Q      Okay.

17    A      -- saying they had to be certified.  They had to

18    go in for training so many hours a year.

19    Q      And it said We didn't start this until 2005?

20    A      Well, I don't -- it's between 2004 and 2006.  I'm

21    not for sure of the date, but sometime in that time

22    period.

23    Q      Okay.  Where did it say -- Did it say on the

24    website we didn't start this program until a certain

25    date?
```

BUSHMAN COURT REPORTING

1    Q      Okay.  So at what point in time did your opinion

2    change from you thought the, the City was responsible

3    to you thought the railroad was responsible?

4    A      After I understood that the trestles had

5    burned --

6    Q      Uh-huh.

7    A      -- and then covered up, and then --

8    Q      When was that?  I mean, wasn't that discussed at

9    the Tuesday meeting following the December 2009 flood

10   in which you were present at City Hall when the City

11   Council met?

12   A      They talked about discussion of that problem,

13   excuse me, with the railroad.

14   Q      Okay.

15   A      And then in a letter that the mayor sent out --

16   Q      Okay.

17   A      -- said that they had discussions with the

18   railroad.  And that was at the time that the railroad

19   came back and said yes, they were aware of the

20   problems, but they had other more urgent issues to take

21   care of.

22   Q      And that's based on what the mayor put out?

23   A      Right.

24   Q      You never talked to anyone from Union Pacific?

25   A      No, I have not.

1          Exhibit 123.

2                    (Exhibit No. 123 was marked.)

3     BY MR. MCKAY:

4     Q      And just to confirm for the record, Exhibit 123

5     is the Complaint that you filed against Goff, Inc.,

6     Goff Realty, Susance Lee, First Security Bank, and the

7     City of Beebe?

8     A      Correct.

9     Q      And in Paragraph Four it says, The City of Beebe

10    knew the house was in the flood plain because it was

11    shown on their flood maps starting in 1977.  So you

12    were aware of that before today?

13    A      Yes.

14    Q      Okay.  And because this address is on the city

15    inventory attached hereto as Exhibit F, which shows the

16    flood level as 220 feet but the lowest floor to be

17    217.09.  City ordinances and FEMA rules require that a

18    house in a flood plain obtain a flood plain development

19    permit from the City.  You were aware of that?

20    A      Yes.

21    Q      Okay.  From which the City requires the lowest

22    inhabitable floor to be the 100 year flood plain,

23    otherwise known as the one percent, also known as the

24    BFE, short for base flood elevation.  You were aware of

25    that?

1          It was built in an area that flooded, and

2    the reason it flooded was because of.the back-up

3    water as a result of the railroad.

4    Q     You didn't say that in your Complaint against the

5    City, though; did you?  Just answer that question.

6    A     No, I do not.

7    Q     Okay.  Do you still believe that the City

8    negligently caused your house to be built below the 100

9    year flood plain, thereby causing damage to you?  Do

10   you still believe that?

11   A     No.

12   Q     And why is it that you do not believe that?

13   A     They did not cause my house to·be built.  They

14   allowed my house to be built.

15   Q     Well, thereby causing damage to you?

16   A     The City's actions allowed water to come up as a

17   result of the railroad damming the overflow of water.

18   I could tell when the water was going to come up the

19   day before it came up every time.

20   Q     But that condition existed before your house was

21   ever built; right?

22                MS. GILBERT:  Objection; that calls for

23        speculation.

24   A     I do not know.

25   Q     Well, do you know how long the railroad has been

1    A      A new map has came out, and this is -- That's

2    what I was saying, the flood plain had changed.

3    Q      Okay.  We have gotten off track.  Let's go back

4    to my question.

5    A      Okay.

6    Q      And you said that you don't think -- You now

7    don't believe the City was negligent, is that true, or

8    do you still hold --

9    A      No, they -- I hold them negligent for allowing

10   houses to be built, allowing the railroad to, to do

11   what it did without permits.  The whole thing that

12   happened the City was liable, but so is the railroad.

13   Q      So you still hold the belief the City was, you

14   believe at least in part, negligent?

15   A      Because they allowed it to happen.

16   Q      Okay.  And had the City required your house to be

17   built above the 220 foot flood plain elevation, your

18   house would not have flooded; right?

19                 MS. GILBERT:  Objection; calls for

20        speculation.

21   A      I do not know.

22   Q      Why is it that you do not know that?

23   A      The house next to us received flood water in it,

24   and it was above the 220.

25   Q      What -- Which house are you talking about, the

BUSHMAN COURT REPORTING

```
 1    Haneys'?

 2    A      No.  One of Ken [sic] Griffin's houses.

 3    Q      What is the address of that?

 4    A      I believe it's -- Ours is 31.  It should be 33.

 5    Q      And you say it got water in the house?

 6    A      Uh-huh.

 7    Q      And you saw the water in the house?

 8    A      No.  But I understood, because they had to do

 9    some replacement of the flooring.

10    Q      Okay.  So that's based on what he, somebody told

11    you?

12    A      Yes.

13    Q      Okay.  And you said that was Keith Griffin?

14    A      Yes.

15    Q      That is one of his houses?

16    A      Uh-huh.

17    Q      And -- Did Mr. Griffin tell you how much water

18    got in 1033?

19    A      He didn't tell me at all.

20    Q      Who did tell you?

21    A      I believe it was Milton McCullar told me.

22    Q      Okay.  Have you seen the Don Beavers report

23    saying that the flood elevation was 220 feet, as far as

24    the, the, the height of the flood waters?

25    A      No.
```

1   Q     Okay.  In -- Back to your Complaint, it states,

2   The City of Beebe has had since 1977 FEMA maps showing

3   this property to be in the flood plain?

4   A     That's correct.

5   Q     And that's the FEMA map we have looked at here

6   today?

7   A     Yes.

8   Q     Do you still hold that belief?

9   A     Yes.  But the flood plain does not specify the

10  height of the flood water.

11  Q     Which is why the City has to do a base flood

12  elevation study?

13  A     That's correct, which is what they did, and they

14  came up with 214.

15  Q     But that was not done until January 2001; right?

16  A     That's correct.

17  Q     And that was after your house was built?

18  A     I do not know.

19  Q     Well, that's certainly after the building

20  inspector signed off on the final inspection; right?

21  A     That's correct, but I can show you one that was

22  issued in 2001 that wasn't built -- the one across the

23  street that wasn't built until 2004.

24  Q     Okay.  But you are not talking about your house;

25  you are talking about somebody else's house?

BUSHMAN COURT REPORTING

1   built above the base flood elevation, which would have

2   been at least the 220 foot 100 year flood plain, we

3   wouldn't be sitting here today?

4              MS. GILBERT:  Objection; that calls for

5        speculation.

6   A     No.

7   Q     Let me ask you this, if -- okay.  Let's assume

8   the flood waters from December 2009 were 220 feet.

9   A     Okay.

10  Q     Had the city required your house to be built

11  above 220 feet, we wouldn't be sitting here today;

12  would we?

13  A     I do not know.  Like I'said, the house next to me

14  was above 220 feet, and it got flooded.  But, it really

15  doesn't matter what elevation my house was built if,

16  because the main factor against the City was they did

17  not establish a BFE.  I mean, they could have

18  established it at 214, which they did.

19  Q     Well, but that was using an improper method

20  according to the federal law; right?

21  A     No.

22  Q     You weren't aware of that?

23              MS. GILBERT:  That calls for

24        speculation; objection.

25  A     That is not correct.

1    Q      Okay.  Why do you say that is not correct?

2    A      Because the Arkansas Resource Commission allowed

3    the -- they didn't accept it, that I can find.  I don't

4    know who accepted it, but they said that was a

5    legitimate way to do a BFE.

6    Q      Who said that?

7    A      One of the members of the Arkansas Resource

8    Commission.

9    Q      In a -- In correspondence?

10   A      To the City.

11   Q      And you have a copy of that letter?

12   A      Yes, I do.

13               MR. MCKAY:  All right.  We would like to

14        request all of the correspondence he got from the

15        City of Beebe, as well as the State, Arkansas

16        Water and Soil Commission, and FEMA.

17   BY MR. MCKAY:

18   Q      And it's your recollection that one of these

19   documents that you are going to produce to us --

20   A      Uh-huh.

21   Q      -- somebody from the State of Arkansas said using

22   an affidavit from residents is an acceptable method of

23   establishing a base flood elevation?

24   A      As far as I recall, it said that FEMA allows

25   that.

1   that?

2   A      Well, if you are in Zone A, you don't have to

3   have as much detailed information.  If you get to Zone

4   AE, if you are, if you are doing development, then you

5   have to have engineering surveys done.

6   Q      Okay.  And where, where did you read that?

7   A      It's in the FEMA regulations.  It's also in the

8   ordinance for Beebe.

9   Q      Okay.

10  A      2003-15.

11  Q      And what does that say in the ordinance, based on

12  your understanding?

13  A      If you develop within a flood plain, develop in a

14  flood plain --

15  Q      Uh-huh.

16  A      -- if you are in Zone A, you -- it doesn't

17  require an engineering survey.  If you are in a Zone

18  AE, it does.  It's got to do with the rise of the

19  water.

20  Q      Your understanding is Zone A does not require a

21  formal study --

22  A      Right.

23  Q      -- and Zone AE does?

24  A      That's correct.

25  Q      And that is based on the City ordinance?

```
1    A      They are supposed to establish one.

2    Q      Okay.  Using the detailed methodology?

3                   MS. GILBERT:  Objection; that calls for

4           speculation.

5    Q      Or do you know?

6    A      No.  Like I said before, there is many different

7    ways that they can establish a BFE.

8    Q      Okay.

9    A      And the affidavit method was one of them.

10   Q      And when, when you say the detailed study is not

11   required in Zone A, what do you base that on?

12   A      I'm talking about development in the zones, like

13   if I went to build a house --

14   Q      Uh-huh.

15   A      -- in a Zone AE, I would have a -- I should have

16   a flood plain development permit, and it should include

17   a study showing that it would not cause the water to

18   rise within the flood plain --

19   Q      Okay.

20   A      -- by one foot.

21   Q      What do you mean "by one foot"?  You have to be a

22   foot over the flood plain?

23   A      Whatever I do within the, any type of development

24   cannot cause the water to rise over one foot within the

25   flood plain.
```

1    A       And the railroad abuts Windwood Meadows.

2    Q       It actually abuts Mr. Guyot's property.   It

3    doesn't join Windwood Meadows; right?

4    A       Okay.  Well, it's right there next to it.

5    Q       Okay.  And you say it's your understanding in

6    Zone A you don't have to have a detailed method; right?

7    A       You don't have to provide a --

8    Q       I'm asking you, what is that based on?  What

9    document can you point me to that says if you are going

10   to develop in Zone A the community does not have to

11   establish by a detailed method the base flood

12   elevation?

13   A       I didn't say that.

14   Q       Okay.  Well, I'm confused then.

15   A       I'm talking about when a developer develops

16   within a flood plain.

17   Q       Okay.  You've got to have a base flood elevation

18   with a detailed method?

19   A       In an AE, the BFE is our --

20   Q       Forget about AE.  We're talking about A.  Let's

21   focus --

22   A       Okay.  You don't have to have a -- There is no

23   requirement in an A for base flood.

24   Q       Okay.  And I am asking you what are you basing

25   that on?  Why do you say that?  What, what document can

BUSHMAN COURT REPORTING

1    you point me to, specific document that says that?

2    A      It says they should establish one, but they --

3    once a BFE is established --

4    Q      No, no, no.  Do you hear my question?  What

5    document says that?  What are you relying on to say

6    that Zone A does not require a base flood elevation?

7    That is what I need to know.

8    A      FEMA regulations.

9    Q      Which ones?  Cite me to a regulation.

10   A      Okay.  Let's just --

11   Q      No, no, no.

12   A      Look at the city ordinance.

13   Q      Wait.  We can't get away from this question.

14   A      I don't have the ordinance in front of -- I mean

15   the FEMA regulations in front of me --

16   Q      Okay.  So --

17   A      -- or I would look it up for you.

18   Q      So as we sit here today, you cannot cite to me a

19   regulation that says when you develop in Zone A you

20   don't have to have a BFE; correct?

21   A      Correct.

22   Q      Okay.

23   A      When you develop -- When a developer develops,

24   you do not have to have a BFE.

25   Q      I know, but you cannot -- As we sit here today,

BUSHMAN COURT REPORTING

```
 1   without seeing the regulations, you cannot cite me to
 2   that regulation; correct?
 3   A     That's correct.
 4   Q     Okay.  All right.  And your knowledge of the
 5   regulations is basically based on your investigation
 6   after these floods; right?
 7   A     That's correct.
 8   Q     Okay.  And I am not trying to sound trite here or
 9   anything, but do you have -- have you ever -- do you
10   have any formal training or education in laws,
11   regulations, interpreting laws that --
12   A     No, I do not.
13   Q     Okay.  Have you ever attended law school?
14   A     Yes, I have.
15   Q     Okay.  When did you attend law school?
16   A     Seventy-one.
17   Q     Okay.  Did you complete lawsuit school?
18   A     No, I did not.
19   Q     Okay.  How many years did you attempt law school?
20   A     I went the first semester.
21   Q     Okay.  Do you remember which classes you took?
22   A     No, I do not.  I found it very boring.
23   Q     Okay.  So is it safe to say you don't remember
24   anything that you learned in law school?
25   A     No.
```

1   failing to follow, the FEMA regulations --

2   A       Yes.

3   Q       -- involving development in the flood plain?

4   A       Uh-huh.

5   Q       Okay.  And when you say "their own regulations,"

6   you are talking about regulations from the City of

7   Beebe?

8   A       Yeah, Ordinance 2003-15.

9   Q       And what were they not doing -- How were they

10  failing to follow the FEMA regulations?

11  A       They were failing to obtain development permits

12  from all developers, including the railroad.

13  Q       You didn't mention the railroad back in January;

14  did you?

15  A       I didn't have to because they were one of the

16  developers.

17  Q       Why do you say the railroad was a developer?  Did

18  the railroad develop any neighborhoods there?

19  A       You don't have to develop neighborhoods.

20  Q       Answer my question.  Did the --

21  A       No, they didn't.  No, you're twisting the word

22  "develop."

23  Q       Well --

24  A       In FEMA's terms "develop" means to change the

25  structure of the land from what it was.

BUSHMAN COURT REPORTING

1    Q       Okay.   And that's based on what?

2    A       Their regulations.

3    Q       Based on the regulations stated by FEMA?

4    A       Yes.

5    Q       All right.   And so they were failing to enforce

6    FEMA's regulations and their own?

7    A       Right.

8    Q       Okay.

9    A       No, they don't have to enforce FEMA's.   They have

10   to follow their own.   FEMA has to see that they

11   enforce -- they follow their own regulations.

12   Q       And you go on to discuss, This includes houses

13   being built in a flood plain without permits.   So you

14   do actually mention houses?

15   A       Yeah.

16   Q       And it says, Also, they have allowed the flood

17   zone to be used for landfill.   So the City had filled

18   in parts of the flood plain and not gotten a permit?

19   A       No, the City didn't do it.

20   Q       Who did that?

21   A       People, including the railroad, when they would

22   dump stuff on the side.

23   Q       Do you have personal knowledge of the railroad

24   dumping stuff on the side?

25   A       When they are maintaining the roadbed.

BUSHMAN COURT REPORTING

1   Q      Okay.   They are maintaining the railroad tracks?

2   A      Yes.

3   Q      Okay.   All right.   Which are used for interstate

4   commerce?

5   A      It doesn't matter.   It's in the flood plain.

6   Q      Do you know that they are used for interstate

7   commerce?

8   A      Oh yes, I do, but it still doesn't matter.   It's

9   in the flood plain.

10   Q      That is based on what?

11   A      What do you mean what it's based on, this map.

12   Q      Well, you say it doesn't matter that --

13   A      According to FEMA, if they develop in it --

14   Q      Okay.   Based on what document?   That's what I'm

15   asking.

16   A      As I said before, FEMA's own regulations.

17   Q      Okay.

18   A      The only person that is excluded is federal land

19   and state --

20   Q      Okay.

21   A      -- as long as the state has their own

22   regulations.

23   Q      And all of this is based on the regulations that

24   you cannot cite me to right now; correct?

25   A      Well, if you want me to look through that thick

1    Q      And this is an email dated May 11th, 2007, the

2    bottom email?

3    A      Yes.

4    Q      Okay.  And you were asking her questions about

5    getting flood plain development permits in Zone AE?

6    A      Uh-huh.

7    Q      And do you recall what her -- Did she ever

8    respond to you, or is that Mike Borengasser that

9    responds?

10   A      Let's see.  Where is that?  He later responded,

11   he went and looked at the houses, and he said the

12   elevation was okay on them and that since they were

13   already built, they really couldn't do anything about

14   them.

15   Q      Okay.  But this -- okay.  You were asking him

16   whether a development permit application was required

17   to build in Zone AE?

18   A      Uh-huh.

19   Q      Okay.  And you say the local flood plain

20   administrator told you that -- let me read it.  It

21   says, A few months ago I was told by the local flood

22   plain administrator that the paving of a ditch located

23   in AE did not require a permit?

24   A      Correct.

25   Q      Okay.  Was that Allen Ridings, or was that --

1   Q      All right.  And it said that they did not have a

2   flood plain development permit?

3   A      Correct.

4   Q      Okay.  And it says those will be three feet

5   higher than yours.  Will these additional houses cause

6   an increase in the flooding problem?  Did he ever

7   address your concerns about flooding problems?

8   A      No, he did not.

9   Q      Okay.  And did you ever get an answer to your

10  question as to whether flood plain development permits

11  were required for those houses being constructed in

12  Zone AE, one of which was next door to you?

13  A      I do not remember.

14  Q      Okay.  Then you tell him that you're concerned,

15  as well as the neighbors, that additional houses will

16  only make a bad situation worse?

17  A      Yes.

18  Q      What are you referring to there?

19  A      Well, it's just like if you have got a fish bowl,

20  and you put a rock in it, and you put another rock, the

21  water will rise up.

22  Q      Okay.

23  A      If there is no way for the water to escape, you

24  are going to end up living in a fish bowl.  And the

25  railroad is the outside of the fish bowl, is the fish

1    in a flood zone.

2    Q      Okay.  But the, the Windwood Meadows Subdivision

3    is, is not within the city limits on that map.

4    A      Yeah, well, what they say is, We don't read maps.

5    Q      Who said --

6    A      I mean, anybody --

7    Q      Wait.  Let's go back to that.

8    A      I mean, the banks say that.

9    Q      Who says we don't --

10   A      Everybody says that.  It says specifically on

11   here Beebe is not in a flood zone, so it's not in a

12   flood zone.

13   Q      That's what the banks are telling you, you said?

14   A      Yeah.

15                  THE VIDEOGRAPHER:  We are going off the

16           record.  It's 1:51 p.m.

17                       (Short break)

18                  THE VIDEOGRAPHER:  We are back on the

19           record.  It's 1:51 p.m.

20   BY MR. MCKAY:

21   Q      I may have asked you this, and if I did I

22   apologize, but before the October 2009 flood did you

23   ever go walk down and look at the railroad trestles and

24   bridges that are in place now between Beebe and Ward?

25   A      No.

1    Q       So any opinions you have as to values of houses

2    in the neighborhood, you agree that would be

3    speculation?

4    A       Yeah.

5    Q       What about do you have any expertise or training

6    or knowledge of estimating flood damage repairs?

7    A       None.

8    Q       Okay.  So same thing, that would be speculation?

9    A       Right.

10   Q       We talked about there was the meeting at City

11   Hall right after the floods.  Then you thought there

12   was maybe one more meeting up at City Hall?

13   A       Uh-huh.

14   Q       Were there any neighborhood meetings that were

15   not held at City Hall?

16   A       No.

17   Q       Other than the other lawsuit where we have marked

18   the complaint as an exhibit and this one, there are no

19   other lawsuits --

20   A       No.

21   Q       -- you have been involved in relating to the

22   flood?

23   A       No.

24   Q       Have you ever been involved in any other lawsuits

25   whatsoever?

BUSHMAN COURT REPORTING

1   Q      Of your house?

2   A      Yes.

3   Q      Okay.  Okay.  Go to Tuesday March 16th, 2010, and

4   it says, District violates City Ordinance 2003-15.  Do

5   you see that one?

6   A      Yes.

7   Q      Okay.  And this refers to a discussion you had

8   with Belinda Shook?

9   A      Yes.

10  Q      And who is Belinda Shook.

11  A      She is superintendent of the Beebe public

12  schools.

13  Q      Okay.  You had a discussion with her where she

14  told you that the City of Beebe was unmapped, according

15  to the FEMA website?

16  A      That's correct.

17  Q      Okay.  And then it says in that second to the

18  last paragraph, When I informed her that this civil

19  engineer was wrong and Beebe had been mapped since

20  1977, are you talking about the 1977 FEMA --

21  A      Correct.

22  Q      -- flood map?

23  A      Uh-huh.

24  Q      You have to answer out loud.  I'm sorry.

25  A      Yes.

1   railroad was within the city limits.

2   Q      Okay.  And did he ever respond, or did you ever

3   make any determination?

4   A      No, he didn't respond, but Milton McCullar did.

5   Q      As to what?

6   A      That the railroad was in the city limits.

7   Q      What part of the railroad?  Did he give you

8   specific mile posts or --

9   A      Not specific mile posts, but to the west -- I

10  mean to the south of Windwood Meadows, and then he

11  said, If you extended a line it would go to another

12  part.  I don't recall exactly.

13  Q      Okay.  But according to the FEMA map, doesn't the

14  City boundary, the 2005 FEMA map, doesn't the city

15  limits stop at the south edge of Windwood Meadows

16  Subdivision?

17  A      That's why I couldn't determine.  That's why I

18  was asking the City.  No, the City -- excuse me, I

19  believe the City, the 2000 map continues on past

20  Windwood Meadows.

21  Q      The 2005 map?

22  A      Yes.

23  Q      If you will go to the first entry on March 17th,

24  2010 --

25  A      Okay.

1    The code enforcement officer and former flood plain

2    administrator, Leonard Fort, signed off on a form to

3    FEMA stating that he had obtained all permits necessary

4    for fill placed in the Guyot addition.

5              The only problem with this is there has

6    never been a permit issued for fill by any Beebe

7    city official; right?

8    A    Correct.

9    Q    Okay.  When you say there has never been a permit

10   issued for fill by any Beebe city official, is that

11   based on reviewing the City's document?

12   A    That's correct.

13   Q    Okay.  And if you are going to fill in a flood

14   plain, do you have to have a permit to do that,

15   according to the regulations?

16   A    That's correct.

17   Q    Okay.  Go to the one December 17th, 2000.  It

18   says, What is the City trying to hide?  Do you see

19   that?

20   A    Yes.

21   Q    And then go down.  There is a section that says,

22   Is the City trying to hide something, question mark.

23   Do you see that near the bottom?

24   A    Yes.

25   Q    It says, I'm sure the mayor is behind this.  The

1              COURT REPORTER'S CERTIFICATE

2    STATE OF ARKANSAS)
                      )ss.
3    COUNTY OF SALINE )

4              I, JANESS FERGUSON SMITH, CCR, RPR, a Notary

5    Public in and for Saline County, Arkansas do hereby

6    certify that the facts stated by me in the caption of

7    the foregoing matter are true; and that the foregoing

8    matter was transcribed by me, to the best of my ability

9    and understanding, from my machine shorthand notes

10   taken at the time and place set out in the caption

11   hereto.

12             In accordance with Rule 30(e) of the Rules of

13   Civil Procedure, review of the transcript was waived by

14   the deponent or a party thereto.

15             I FURTHER CERTIFY that I am neither counsel

16   for, related to, nor employed by any of the parties to

17   the action in which this proceeding was taken; and,

18   further that I am not a relative or employee of any

19   attorney or counsel employed by the parties hereto, not

20   financially interested or otherwise, in the outcome of

21   this action.

22             GIVEN UNDER MY HAND AND SEAL OF OFFICE on
     this, the 29th day of April, 2011.
23

24                        JANESS FERGUSON SMITH, CCR, RPR
                          NOTARY PUBLIC-SALINE CO.-Saline County
25                        CERTIFIED COURT REPORTER
                          ARKANSAS SUPREME COURT
                          Certificate Number 453

BUSHMAN COURT REPORTING