IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DERRICK AND ANITA SEYMORE;
SHANE SMITH; THADDEUS AND
KAY WINTERS; BRIAN AND STEPHANIE
PARKER; KEITH GRIFFIN;
ARNOLD AND SHELBY FELBERMAYER;
JAMES AND NORMA TAYLOR;
GENE AND EMMA ADAMS;
CONNIE AND STEWART KIRBY;
GREGORY HORNESS;
ANTHONY AND SHERRY HEALY;
LINDA CRIDER; JONATHAN AND
RENEE GORDON

                                                      PLAINTIFF

VS.             NO. 4:10-CV-239 BSM

UNION PACIFIC RAILROAD COMPANY

                                                      DEFENDANT


ORAL DEPOSITION

OF

DON BEAVERS
(Taken April 5, 2011)

1   A.   Simple fact.  If the water is lower on that side, it
2   means that the track itself is backing it up that two to three
3   feet.  If it's there, it means it has to be backing it up.
4   That's all we're saying; okay?
5   Q.   Do you know if an additional trestle in that area would
6   have reduced the water level in the neighborhood?
7   A.   If there was sufficient size of trestle, yes.  Now, how
8   much that would take, whether it takes a 20-foot trestle or a
9   500-foot trestle, that would have to be done by a hydrologist.
10  Q.   Okay.  So, as we sit here today -- let me ask you, do you
11  have any knowledge of trestles that were removed in this area?
12  A.   I have been told that sometime in the early '90s, there
13  was a trestle that caught fire.
14  Q.   Who told you that?
15  A.   The mayor is the one told me.  He said he was with the
16  fire department at that time and they had to put the fire out.
17  Q.   Okay.
18  A.   Went down to put the fire out.  And --
19  Q.   Do you know the length of that trestle?
20  A.   No, sir, I don't.
21  Q.   Okay.
22  A.   And instead of building the trestle back, the railroad
23  just filled it in.
24  Q.   Do you have knowledge of any other trestles being removed
25  in this area?

A. No, sir. That's the only one I know that's had to be removed.

Q. Okay.

A. I did see an old map that showed three or four trestles in that area, but I don't know where that map is now. I haven't been able to find it lately, so I don't know why the --

Q. Okay. As we sit here --

A. And I don't know if they were ever in there, frankly, because like I said, this was an old map.

Q. Okay. But as you said, you've done no calculations? You've calculated no flow rates under the existing trestles?

A. No, sir.

Q. And as we sit here today, you cannot state whether the trestle that was taken out had any impact on the level of water that flooded Windwood Subdivision; is that true?

A. No, it's not true. I can't tell you how much effect it had.

Q. Okay.

A. But any additional opening would have lowered the level at that point.

Q. But you can't say how much?

A. No, sir, I cannot.

Q. Okay. Well, let's assume it lowered it one inch.

A. Okay. One inch, two inch. Okay.

```
 1   Q.   If a house had 29 inches of water in it, one inch is not
 2   going to make a difference as far as the floods?
 3   A.   That's correct.
 4   Q.   Let's say you lowered it four inches. That's not going
 5   to make any difference to that house that has 29 inches of
 6   water in it.
 7   A.   I agree.
 8   Q.   Correct? Okay. Let's say ten inches. That's not going
 9   to make any difference as far as the damage that's caused to a
10   house that floods; right?
11   A.   I would assume that you're right and you can go on, but
12   it's not necessary for my benefit. I know where you're
13   getting to. But I'm just saying that any additional opening
14   would have assisted; okay? How much, I don't know.
15   Q.   Okay.
16   A.   Additional opening should have dropped it two to three
17   feet.
18   Q.   Okay. There are ways to determine how much opening you
19   would need in order to reduce it two or three feet; correct?
20   A.   Yes. It could be done.
21   Q.   And there are manual calculations you can do?
22   A.   Yes, there is.
23   Q.   There are equations you can follow to do that?
24   A.   Uh-huh.
25   Q.   You have to answer out loud.
```

Gwendolyn R. LaSalle, CCR
Bushman Court Reporting
(501) 372-5115

| | |
|---|---|
| 1 | A. Yes, sir, there are. |
| 2 | Q. There are computer simulations you could do to determine that? |
| 4 | A. Yes, sir. |
| 5 | Q. Do you all have that type of capability here? |
| 6 | A. Yes, sir, we do. |
| 7 | Q. Okay. But you didn't do any of that in this case? |
| 8 | A. No, sir. |
| 9 | Q. And if you wanted to give an opinion to a reason degree of engineering certainty, you would go through and do some formal analysis like that; right? |
| 12 | A. If I was designing an additional structure, yes, sir. I would have to do that type of analysis. |
| 14 | Q. Okay. |
| 15 | A. But for what I have been asked to do, no, sir. |
| 16 | Q. When you say what you've been asked to do, what were you asked to do? |
| 18 | A. Just simply look at the flood and what had happened. |
| 19 | Q. Okay. |
| 20 | A. And to give a general idea of what might be going on; okay? |
| 22 | Q. Okay. You say give a general idea as to what might be going on, so you can't say with any certainty what was going on as far as the trestles and water levels? |
| 25 | A. I agree with that, except there was a definite drop in |

1  Q.  If a house had 29 inches of water in it, one inch is not
2  going to make a difference as far as the floods?
3  A.  That's correct.
4  Q.  Let's say you lowered it four inches.  That's not going
5  to make any difference to that house that has 29 inches of
6  water in it.
7  A.  I agree.
8  Q.  Correct?  Okay.  Let's say ten inches.  That's not going
9  to make any difference as far as the damage that's caused to a
10 house that floods; right?
11 A.  I would assume that you're right and you can go on, but
12 it's not necessary for my benefit.  I know where you're
13 getting to.  But I'm just saying that any additional opening
14 would have assisted; okay?  How much, I don't know.
15 Q.  Okay.
16 A.  Additional opening should have dropped it two to three
17 feet.
18 Q.  Okay.  There are ways to determine how much opening you
19 would need in order to reduce it two or three feet; correct?
20 A.  Yes.  It could be done.
21 Q.  And there are manual calculations you can do?
22 A.  Yes, there is.
23 Q.  There are equations you can follow to do that?
24 A.  Uh-huh.
25 Q.  You have to answer out loud.

```
 1    the water level; okay?
 2    Q.   When you say there's a definite drop in the water
 3    level --
 4    A.   Between one side of the railroad berm and the other one
 5    for this particular rainfall, this particular flood.
 6              MR. SWINDOLL:  Can we take a short break?
 7              MR. McKAY:  Yeah.  We need to take a short
 8         break.
 9              (Off the record from 2:45 p.m. to 2:49 p.m.)
10    BY MR. McKAY:
11    Q.   Going down to your last sentence on January 22, 2010, in
12    that correspondence it says, "It appears that additional
13    openings under the track would have reduced the flooding
14    level," but as you testified, you performed no calculations.
15    I think it was on that same page you were on.
16    A.   That's January 11th here.
17              MR. SWINDOLL:  The 20th.
18              MS. OWINGS:  Oh, okay.  I thought he said the
19         10th, and I was looking for the 10th.
20              MR. McKAY:  Well, it does say January 20th.
21              MR. SWINDOLL:  Yeah.  It's the 20th.  It's the
22         first one.
23              THE WITNESS:  Okay.
24              MR. SWINDOLL:  They go chronologically
25         backwards.
```

Gwendolyn R. LaSalle, CCR
Bushman Court Reporting
(501) 372-5115

1          THE WITNESS: Oh, okay. All right. Yeah. I
2    got you.
3  BY MR. McKAY:
4  Q.   Your very last sentence is, "It appears that additional
5  openings under the track would have reduced the flooding
6  level." Again, that statement is not based on any
7  calculations you performed?
8  A.   It's based on the observation of the level of water on
9  each side of the track. Yes, sir.
10 Q.   Okay. But you can't say how much it would have reduced
11 flooding?
12 A.   Well, if enough openings are in there, it would have
13 reduced that amount, the two to three foot, period.
14 Q.   Okay.
15 A.   Okay?
16 Q.   But as to the trestles that were removed, you cannot say
17 how much the water level would have been reduced had those
18 trestles not been removed?
19 A.   No, I cannot.
20 Q.   Okay. What is a base flood elevation?
21 A.   Base flood elevation is given on the current flood maps.
22 And I say current. The last one we have, which actually I
23 haven't gotten one in the last few months, but was 220 in the
24 area that we're talking about.
25 Q.   Okay.

1  those floods.
2  Q.  Okay.  But you can't say how much or how often?
3  A.  If enough structures were under there, it should lower it
4  by the two to three feet that I talked about.  It should at
5  least almost level out between one side or the other.  And
6  that's if you've got sufficient structures; okay?
7  Q.  So, what do you consider -- how many structures would it
8  take to lower it two feet?
9  A.  Without proper analysis, without a detailed analysis, I
10 don't know.
11 Q.  How many structures would it take to lower it three feet?
12 Same answer?
13 A.  Yeah.  That's the same answer, period.
14 Q.  Okay.
15 A.  Okay?
16 Q.  Okay.  Back to the base flood elevation, that is the
17 elevation that cities require people to build above when
18 they're building in a low lying area or floodplain?
19 A.  It's the elevation that FEMA requires that the lowest
20 finished floor of the structure shall be at or above that
21 elevation in order to get a building permit; okay?
22 Q.  Okay.
23 A.  Doesn't mean you can't build in it.  Just means that the
24 floor has got to be up there.
25 Q.  Have you been involved in establishing base flood

1  has got a little difference.
2  Q.  Yeah.
3  A.  But it's not going to be great amounts in one small area.
4  Q.  Okay. But those basic determinations are determined
5  qualitative judgments that engineers like you make all the
6  time, aren't they?
7  A.  Yes, sir. Uh-huh.
8  Q.  And in fact, you made a qualitative judgment in this case
9  based on everything that you saw out there, that the water was
10 different on one side than another.
11 A.  We made an observation of the high water marks --
12 Q.  Yes.
13 A.  -- knowing that it went across the rails and the high
14 water mark on the downstream side. Yes, we did.
15 Q.  And those are basic engineering premises you'd have to
16 have to determine whether or not the change that you suggested
17 in the last paragraph?
18 A.  That's correct.
19 Q.  And this was what the last paragraph is based on, those
20 basic engineering perceptions that you saw.
21 A.  Let me see. Let me check that last paragraph again in
22 that letter and make sure I know what I'm saying here; okay?
23 Q.  Yeah.
24 A.  Yes. Okay. That is correct.
25 Q.  Okay.

MR. SWINDOLL: Okay. I don't have anymore.

BY MR. McKAY:

Q. Just a few more follow-up questions. You said you wouldn't think. In your last statement, you said 2009 would not have been as big a flood if the railroad tracks were not there.

A. No.

Q. But again, you can't say how much the flood would have been reduced; right?

A. That's right.

Q. Okay.

A. That's right. And the term I used, too big, is really not as high.

Q. Okay.

A. That's what I should have said; okay?

Q. Okay. With regard to Plaintiff's Exhibit 1, Mr. Swindoll asked you a question about you going out and measuring the high water mark, but as you testified earlier, you really did not measure the high water mark; right?

A. Not precisely.

Q. When you went out there, was there still water on both sides of the track?

A. No.

Q. Okay. So, there was not water on both sides of the track?

```
                    C E R T I F I C A T E

STATE OF ARKANSAS}
                 }ss.
COUNTY OF PULASKI}

RE:   ORAL DEPOSITION OF DON BEAVERS

        I, GWENDOLYN R. LASALLE, Certified Court Reporter,
do hereby certify that the transcript of the foregoing
deposition accurately reflects the testimony given; and that
the foregoing was transcribed by me, or under my supervision,
on my Eclipse computerized transcription system from my
machine shorthand notes taken at the time and place set out on
the caption hereto, the witness having been duly cautioned and
sworn, or affirmed, to tell the truth, the whole truth and
nothing but the truth.
        I FURTHER CERTIFY that I am neither counsel for,
related to, nor employed by any of the parties to the action
in which this proceeding was taken; and, further, that I am
not a relative or employee of any attorney or counsel employed
by the parties hereto, nor financially interested, or
otherwise, in the outcome of this action.
        In accordance with the Arkansas Rules of Civil
Procedure, Rule 30(e), review of the foregoing transcript by
the witness was requested by the deponent or a party thereto.
        GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the
8th day of April, 2011.


                              Gwendolyn R. LaSalle, CCR
                              LS Certificate No. 510
```

Gwendolyn R. LaSalle, CCR
Bushman Court Reporting
(501) 372-5115