```
                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF ARKANSAS
                            WESTERN DIVISION

DERRICK AND ANITA SEYMORE;
SHANE SMITH; THADDEUS AND
KAY WINTERS; BRIAN AND STEPHANIE
PARKER; KEITH GRIFFIN;
ARNOLD AND SHELBY FELBERMAYER;
JAMES AND NORMA TAYLOR;
GENE AND EMMA ADAMS;
CONNIE AND STEWART KIRBY;
GREGORY HORNESS;
ANTHONY AND SHERRY HEALY;
LINDA CRIDER; JONATHAN AND
RENEE GORDON
                                                 PLAINTIFF

VS.             NO. 4:10-CV-239 BSM

UNION PACIFIC RAILROAD COMPANY
                                                 DEFENDANT
```

VIDEOGRAPHIC DEPOSITION

OF

MILTON McCULLAR
(Taken April 28, 2011)

**ORIGINAL**

Gwendolyn R. LaSalle, CCR
Bushman Court Reporting
(501) 372-5115

```
 1         How long have you worked for the City of Beebe?
 2   A.    I've worked for the City of Beebe since 2006, July
 3   the 24th, 2006.
 4   Q.    Okay.  Are you from Beebe originally?
 5   A.    Since about the ninth grade.
 6   Q.    Okay.  What did you do before you worked for the City of
 7   Beebe?
 8   A.    I worked for Remington Arms Company for 34 1/2 years.
 9   Q.    What did you do for Remington?
10   A.    Well, just about everything.  I started as a general
11   worker, and then I worked my way up to a supervisor.  Then I
12   was a maintenance supervisor, and that's what I was when I
13   retired.  I had the tool room and the machine shop.
14   Q.    Okay.  What's your educational background?  Did you
15   graduate from high school in Beebe?
16   A.    High school, a little bit of college, vocational
17   training.
18   Q.    Okay.  Where did you go to college?
19   A.    Right here in Beebe.
20   Q.    ASU?
21   A.    ASU Beebe.
22   Q.    Okay.
23   A.    Not much of a college.
24   Q.    Did you earn any sort of degree from ASU?
25   A.    No, sir.
```

```
 1    Q.   Okay. Did you take just general courses, or did you take
 2    any courses in a specific discipline?
 3    A.   Oh, sociology and English I. And I took a business
 4    management class.
 5    Q.   How many semesters did you attend ASU?
 6    A.   Two semesters.
 7    Q.   Okay. And then you said you had some vocational
 8    training, also?
 9    A.   Yes, sir.
10    Q.   And what did that consist of?
11    A.   Machine shop and tool and die --
12    Q.   Okay.
13    A.   -- at Searcy Vo-tech, vocational technical school.
14    Q.   Okay.
15    A.   And at Pulaski County Vocational Technical School.
16    Q.   Okay. And you said you were with Remington for 34 years.
17    I presume you retired from Remington?
18    A.   Yes, sir.
19    Q.   Okay. And then you were employed by the City beginning
20    in 2006?
21    A.   That's correct.
22    Q.   Do you remember what month you joined the City?
23    A.   July.
24    Q.   Okay. And what was your first job with the City?
25    A.   I worked for the street department as just a -- I don't
```

```
 1   know what the title was.  It was just a worker.  I wasn't
 2   supervisor.
 3   Q.   Okay.
 4   A.   I just worked for the street department.
 5   Q.   Okay.  Manual labor worker?
 6   A.   Yes, sir.
 7   Q.   And what are the types of things you performed in that
 8   role, types of duties, tasks?
 9   A.   Anything the City needed done.  Limb and leaf pickup, the
10   mowing, trash pickup, cleaning up the parks, lots of stuff.
11   Q.   Okay.
12   A.   Just a varied amount of things.
13   Q.   Okay.  And how long did you hold that position as a labor
14   worker in the street department?
15   A.   Until the first of 2007.
16   Q.   January 2007?
17   A.   Yes.
18   Q.   Okay.  And then what did you -- what were your duties as
19   of January 2007?
20   A.   The street department supervisor, Stanley Woods, retired.
21   Q.   Okay.
22   A.   And I applied for that job and was able to get that job
23   there.  The mayor hired me for the street department
24   supervisor.
25   Q.   Okay.  Who was the mayor at that time?
```

```
1    A.   It was Mike Robertson.
2    Q.   Okay.  When you joined the city staff in July 2006, was
3    the mayor Mike Robertson?
4    A.   No, sir.
5    Q.   Was it Don Ward?
6    A.   Yes, sir.
7    Q.   Okay.  Did Don Ward actually hire you?
8    A.   No, sir.
9    Q.   Okay.  Who hired you?
10   A.   Oh, excuse me.  Donald Ward hired me for the street
11   department.
12   Q.   Yes.
13   A.   Yes.
14   Q.   Okay.  Okay.  So, in January 2007, you became the street
15   department supervisor.
16   A.   Yes, sir.
17   Q.   And that's the position you hold today?
18   A.   Yes, sir.
19   Q.   And what do your duties entail as a street department
20   supervisor?
21   A.   They're -- let's see.  Oversee all the street department
22   work; limb and leaf job, oversee that; make sure that the crew
23   has equipment to do their work, that we have all the spare
24   parts; keep all the equipment running; general maintenance on
25   some of the buildings that I can perform.  Really just
```

1  Q. Okay. That area is kind of a swamp-type area, isn't it?
2  A. You could call it a swamp-type area. Yes.
3  Q. Okay. And that land that the lift station is on, is that
4  owned by the City, or does the City just have an easement over
5  Mr. Guyot's land?
6  A. I think that's owned by Mr. Guyot and has an easement.
7  Q. Okay. And did you have any opinions when you saw the
8  vegetation? Did you form any opinions?
9  A. My opinion is that the water didn't have enough area to
10 get out, because it was rushing southward, underneath the
11 trestle.
12 Q. So, it's your opinion the trestle opening was not big
13 enough to allow water to go out?
14 A. That's my opinion. That's correct.
15 Q. Okay. But as you said, you don't have any education,
16 training, or experience in hydrology or studying floods or --
17 A. No, sir. My --
18 Q. -- calculating flow rates or anything like that?
19 A. No formal education, but I have worked with a lot of
20 ditches, ditch digging, and drainage in my time with the City.
21 And that would be probably the extent of it. You know, as far
22 as for studying flows and flows of water and flooding, no, I
23 don't have any education on that.
24 Q. Okay.
25 A. But it doesn't take a lot of education on drainage and

1   that would calculate that. There was a lot of water.
2   Q. Well, engineers can come in and study that; right?
3   A. I could not tell you that.
4   Q. Okay. All right. So, your opinion that the opening is
5   not big enough is not based on any data or scientific
6   methodology; right?
7   A. Just based on my common sense.
8   Q. Okay. Which is not based on any data or scientific
9   methodology; right?
10  A. Just my common sense.
11  Q. Okay. But you have no background in scientific
12  methodologies of --
13  A. That's correct.
14  Q. -- determining flood rates or flow rates or whether an
15  opening is big enough; right?
16  A. That is correct.
17  Q. Okay. And you've had no education, training, or
18  experience in doing flood studies?
19  A. No, sir.
20           MR. SWINDOLL: May I have a break?
21           MR. McKAY: Yeah. Let's take a quick break.
22           THE VIDEOGRAPHER: We're going off the record.
23      It's 10:02 a.m.
24           (Off the record from 10:02 a.m. to 10:06 a.m.)
25           THE VIDEOGRAPHER: We're back on the record.

Case 4:10-cv-00239-BSM   Document 66-34   Filed 09/02/11   Page 8 of 10

55

    1          It's 10:06 a.m.

    2  BY MR. McKAY:

    3  Q.    Back to your opinion that the openings were not large

    4  enough under the bridges and trestles, how many -- do you know

    5  how large the drainage basin is for Cypress Creek?

    6  A.    No, sir.

    7  Q.    Okay.  Do you know how many bridges or trestles are

    8  located in the Cypress Creek drainage basin?

    9  A.    No, sir.

   10  Q.    Okay.  Do you know the length of any of the bridges?

   11  A.    No, sir, I do not.

   12          THE REPORTER:  I'm sorry.  Can you speak up for

   13      me?

   14          THE WITNESS:  No, I do not.

   15  BY MR. McKAY:

   16  Q.    So, and you said you don't -- you didn't do any

   17  calculations whatsoever, and really that's outside of your

   18  area of expertise?

   19  A.    That's correct.

   20  Q.    Okay.  So, you would have no calculations or estimates as

   21  to how large an opening would have to be in order to avoid a

   22  flood in the Windwood Meadows Subdivision; right?

   23  A.    No, sir, I would not be able to calculate that.

   24  Q.    And you couldn't say how large openings would have to be

   25  to reduce the water levels in Windwood Meadows by a certain

Gwendolyn R. LaSalle, CCR
Bushman Court Reporting
(501) 372-5115

1  amount?
2  A. No, sir.
3  Q. Okay. Other than you thought the opening between the
4  water and the bridge was not large enough on the trestles that
5  you looked at -- and did you look at more than one trestle?
6  A. Yes, sir. I did after the October flood. I walked all
7  the way down to the Cypress Creek Bridge.
8  Q. Okay.
9  A. And there's more trestles there, but I don't recall how
10  many.
11  Q. Okay. All right. Besides your opinion that the openings
12  weren't large enough between the trestle and the water, did
13  you have any other -- form any other opinions on that
14  occasion?
15  A. I just was looking to see why there was flooding. And
16  no, I don't have any other opinion. I just tried to
17  investigate, see why the flooding was there.
18  Q. Did someone ask you to go down there and look at the
19  trestles, or is that something you took it upon yourself to
20  do?
21  A. I'm trying to remember. I don't recall. The mayor may
22  have asked me to do that. I may have brought that up to him.
23  Q. Okay.
24  A. We discussed why it was flooding, but I don't recall if
25  he asked me to or if I brought it to him and suggested that I

```
 1                    C E R T I F I C A T E

 2   STATE OF ARKANSAS}
                      }ss.
 3   COUNTY OF PULASKI}

 4   RE:   ORAL DEPOSITION OF MILTON McCULLAR

 5           I, GWENDOLYN R. LASALLE, Certified Court Reporter,
     do hereby certify that the transcript of the foregoing
 6   deposition accurately reflects the testimony given; and that
     the foregoing was transcribed by me, or under my supervision,
 7   on my Eclipse computerized transcription system from my
     machine shorthand notes taken at the time and place set out on
 8   the caption hereto, the witness having been duly cautioned and
     sworn, or affirmed, to tell the truth, the whole truth and
 9   nothing but the truth.
             I FURTHER CERTIFY that I am neither counsel for,
10   related to, nor employed by any of the parties to the action
     in which this proceeding was taken; and, further, that I am
11   not a relative or employee of any attorney or counsel employed
     by the parties hereto, nor financially interested, or
12   otherwise, in the outcome of this action.
             In accordance with the Arkansas Rules of Civil
13   Procedure, Rule 30(e), review of the foregoing transcript by
     the witness was not requested by the deponent or any party
14   thereto.
             GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the
15   10th day of May, 2011.

16

17

18                          Gwendolyn R. LaSalle, CCR
                            Certificate No. 510
19

20

21

22

23

24

25

                         Gwendolyn R. LaSalle, CCR
                         Bushman Court Reporting
                            (501) 372-5115
```